E4nQpreC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    IN RE:  PREGIUM RESOURCES INC.
      SECURITIES LITIGATION
 4                                         13 CV 7552 (VSB)

 5    ------------------------------x
                                          New York, N.Y.
 6                                        April 23, 2014
                                          2:30 p.m.
 7
      Before:
 8
                         HON. VERNON S. BRODERICK
 9
                                          District Judge
10
                              APPEARANCES
11
      POMERANTZ LLP
12         600 Third Avenue, 20th Floor
           New York, NY 10016
13         Attorneys for Plaintiffs
      JEREMY A. LIEBERMAN
14    MICHELLE CARINO

15    THE ROSEN LAW FIRM P.A.
           275 Madison Avenue, 34th Floor
16         New York, NY 10016
      LAWRENCE M. ROSEN
17
      GIRARD GIBBS LLP
18         711 Third Avenue, 20th Floor
           New York, NY 10017
19         Attorney for Movant Yeo
      JOHN A. KEHOE
20
      PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
21         1285 Avenue of the Americas
           New York, NY 10019
22         Attorneys for Defendants
      DANIEL J. KRAMER
23    WILLIAM BALY MICHAEL

24

25
```

E4nQpreC

```
 1              (In open court; case called)

 2              THE DEPUTY CLERK:  Counsel, state your name for the

 3   record.

 4              MR. LIEBERMAN:  Good afternoon, your Honor.  Jeremy

 5   Lieberman from Pomerantz firm on behalf of lead plaintiffs.

 6              THE COURT:  Good afternoon.

 7              MS. CARINO:  Michelle Carino, also from the Pomerantz

 8   firm.

 9              MR. ROSEN:  Lawrence Rosen from Rosen Law Firm for

10   lead plaintiffs.

11              MR. KEHOE:  John Kehoe on behalf of additional

12   plaintiff Michael Yeo.

13              MR. KRAMER:  Your, Honor Daniel Kramer from Paul Weiss

14   for the defendants.  With me is my partner Bill Michael.

15              THE COURT:  Good afternoon.  You may be seated.

16              I will leave it up to counsel, but for purposes of

17   this proceeding, you don't feel you need you have to stand

18   necessarily to address the Court, but since we are all trained

19   to do that, I can understand if you are creatures of habit and

20   do that.  Just so you don't get out of the habit because the

21   next courtroom you're in, the rules may be a little different.

22              Let me just review for the parties the materials I

23   have for today's conference, which is a premotion conference.

24              I have the April 9, 2014 letter from Mr. Kramer.  I

25   have the April 14 letter from the defense.  Am I correct?  Was
```

E4nQpreC

1    that on behalf of both the individual plaintiffs and -- I don't

2    know who it was from, the Rosen Law Firm.

3            MR. LIEBERMAN:  Your Honor, the April 14 letter is

4    from the Rosen Law Firm on behalf of plaintiffs, and

5    Mr. Kramer's letter was on behalf of the defendants.

6            THE COURT:  Was there any other material submitted in

7    connection with today's appearance?

8            MR. KRAMER:  I don't think so, your Honor.

9            THE COURT:  Let me sort of explain the way I would

10   like to proceed.  I have some questions.  Some of them are

11   factually related; some of them are legal.  Some of them I

12   don't necessarily expect answers from you today, but to the

13   extent that briefing is going to go forward, and it does appear

14   there is going to be some form of briefing going forward, some

15   of questions I would like you to think about addressing in your

16   papers because there are questions that came to my mind as I

17   was reviewing the letters and the complaint itself.

18           Since this case was transferred to me, I just want to

19   review something so I have a complete understanding

20   procedurally where the case stands.  My understanding is that

21   there had been several complaints and that there was a

22   consolidated amended complaint that was filed which is the

23   complaint that currently are the subject of the premotion

24   letters.  Is that correct?

25           MR. LIEBERMAN:  That's correct, your Honor.

E4nQpreC

```
1          THE COURT:  One of the purposes for my premotion

2    letter, especially in the motion to dismiss context, is to

3    provide the plaintiff with an opportunity -- I'm saying this,

4    you do get a chance to amend.  If Mr. Kramer once he puts in

5    his papers, and you respond, and once I decide the motion -- I

6    would say I'm giving you an opportunity once Mr. Kramer puts in

7    his papers, and if you need more time to consider that and you

8    put in your papers, that's fine; but once I actually decide the

9    motion, the issues that he has raised are the issues that are

10   raised, and in order for you to then seek leave to amend, you

11   would have to come up with good cause, and good cause being

12   something that occurred between the time of the filing of the

13   motion and the time of my decision that would cause you to be

14   able to amend your complaint.

15          In other words, this is an opportunity, I think --

16   obviously, I am not asking you to do that on the basis of a

17   three-page letter, but I imagine that the briefing will outline

18   all of the deficiencies the defendant believes are in the

19   complaint.  You may disagree with that, which is fine, in which

20   case we will brief it, and I will render a decision.

21          I just wanted to let you know, or put you on notice,

22   so to speak, that that is the way I view this process because I

23   don't want to waste your time in waiting for a decision, and,

24   quite frankly, the judicial resources if where we are going to

25   end up is you are going to move to amend and we're going to
```

E4nQpreC

1    have an amendment.

2            MR. LIEBERMAN:  I understand that, your Honor.  It

3    sounds like we will get the motion papers to first see if

4    that's appropriate.  Based upon the current letter, that is

5    really--

6            THE COURT:  Yes.  Again, I guess I could say I'd base

7    it on a three-page letter, but that wouldn't seem to me to be

8    logical; but, yes, you will have an opportunity to do that.

9    Take both my comments and then the argument of counsel today

10   and the back-and-forth for both parties to decide how to

11   structure your arguments going forward.

12           There is a legal question I have, and I don't know the

13   answer to this.  Mr. Kramer, in your letter, you indicate that

14   many or most of the statements are opinions, and you also

15   mention forward-looking statements.  I haven't had an

16   opportunity to look at the difference necessarily between a

17   forward-looking statement and an opinion and whether as a legal

18   matter there is a difference.

19           Mr. Kramer?

20           MR. KRAMER:  I apologize.  I have a hard time

21   addressing the Court sitting down.

22           THE COURT:  That's fine.

23           MR. KRAMER:  So I apologize.

24           There is a difference.  Just very briefly, matters of

25   opinions or estimates, the Second Circuit in the case of a

E4nQpreC

1    called Fait talked about estimates and spoke a bit about how

2    courts ought to address them in this context.  So, here, the

3    statements at issue principally are estimates about how much

4    gold is in the ground, right?  And what the Second Circuit said

5    with respect to estimates in Fait is that in order to plead a

6    claim as to an estimate, a securities fraud claim in this case,

7    you have to have both objective and subjective falsity.  So the

8    estimate must be objectively wrong.  They have to allege facts

9    from which the Court could find that they've alleged that the

10   estimate about how much gold was in the ground was wrong.

11         But also because it's a statement of estimate and

12   opinion, they also have to allege subjective falsity.  It's not

13   enough that the statement turned out to be false, but the

14   speaker must have believed it was false at the time because

15   that's a difference between an opinion being wrong and an

16   opinion being fraudulent.  So, when we talk about estimates or

17   opinions, I would say that Fait governs, and that's the legal

18   rubric.

19         However, statements, regular statements, statements of

20   opinion, whatever, can also be forward-looking statements.

21   They can speak to something in the future.  With respect to

22   that, there is a whole other regime from the PSLRA that

23   applies; and for our purposes what I think is important is that

24   when you think about scienter or intent that plaintiffs have to

25   allege with respect to a forward-looking statement, if your

E4nQpreC

1    Honor were to find that a statement was a forward-looking

2    statement, then what they would have to plead and eventually

3    prove is that there was actual knowledge that the statement was

4    false; not just recklessness, as can be proven for some

5    statements, but actual knowledge of falsity.

6          And sometimes -- and in this case, it's our position,

7    you will have statements of estimate that are forward-looking

8    statements.  So we would say plaintiffs are going to be put to

9    the burden of Fait, objective and subjective falsity --

10          THE COURT:  Yes.

11          MR. KRAMER:  -- and also on the scienter grounds have

12    to show actual intent to defraud.

13          THE COURT:  Thank you.  That was helpful.  So,

14    forward-looking and opinions with regard to some of the

15    statements, it sounds like that you are alleging that the

16    plaintiff will have to be put to its burden.

17          With regard to that, you know, specifically with

18    regard to scienter, and I get when Strathcona arguably begins

19    making noises about whether it be called red flags or whether

20    you call it warnings, whatever you might say, that there's a

21    disagreement that arises.  I understand sort of that part of

22    the complaint.  I think Mr. Kramer has pointed out that he

23    believes that at best that date is around January of 2013, I

24    believe.  June.  Sorry

25          MR. KRAMER:  Correct.

E4nQpreC

1          THE COURT:  January Strathcona was retained.

2          MR. KRAMER:  Correct.

3          THE COURT:  June is when he mentions that he believes

4     that that's the earliest.

5          Let me ask, before I ask plaintiff's counsel,

6     Mr. Kramer, I have a question with regard to June.  I don't see

7     a specific allegation that says June 2013 in the complaint.

8     There is a May allegation at paragraph 46.

9          MR. KRAMER:  Right.

10          THE COURT:  That speaks in terms of that drilling was

11     about to start or something like that.

12          MR. KRAMER:  Correct.

13          THE COURT:  So how do you get June?

14          MR. KRAMER:  So, that's correct.  I think the gravamen

15     of plaintiff's complaint here is that there was a dispute

16     between these two experts, and the nature of that dispute

17     should have caused the defendants to realize that the estimate

18     was wrong and have to make disclosures.  I think that is

19     seniority of the gravamen of the claim.

20          Your Honor is correct that the first expert is

21     Snowden.  They're the ones that do the estimate.  The second

22     expert that is brought in is Strathcona.  Strathcona is hired

23     January 2013, and they're hired to do bulk sampling.

24          The complaint alleges that they did their first drill

25     in May.  In fact, the document that the complaint relies on for

E4nQpreC

1    that makes it clear it's May 28, 2013.  Your Honor, in

2    connection with the motion to dismiss, you can take notice not

3    just of the allegations in the complaint but all documents that

4    the complaint refers to and documents filed with the SEC.  So,

5    in our motion to dismiss, we will show you the document that

6    the complaint refers to for the May date, and the first hole is

7    drilled May 28.

8        The allegation is it's the results from that drilling

9    that eventually leads Strathcona to believe that the Snowden

10   estimate is incorrect.  So what we say to the Court is, OK, as

11   one issue, if, in fact, it's this dispute between Strathcona

12   and Snowden that is supposed to put my client on notice that

13   there's an issue, that dispute at the earliest could not have

14   been before June 2013 because the first drill hole was May 28,

15   and they didn't have any even preliminary results before the

16   first drill hole.  So, that means, by necessity, it's after

17   May 28.  And that's just the first drill.  The bulk sampling

18   goes on and on; they do a lot of work.

19       So, plaintiffs don't allege precisely when the dispute

20   arose.  They don't allege precisely when my client is supposed

21   to be on notice of it, but it can't be before June 2013 because

22   the work hadn't even started yet, and my client discloses the

23   resignation and the nature of the dispute in October.

24       So, one of the issues for the Court, we believe, is

25   can you really have a securities fraud case where the issue

E4nQpreC

1    that is supposed to put defendants on notice that there may be

2    some problem only arises at June or later -- they don't allege

3    when -- and the disclosure is in October.  The securities laws

4    permit defendants a certain amount of time to analyze and react

5    to what they claim are red flags and disclose.

6           So, we think there is no claim there.  We think there

7    is no scienter, but even if there were a claim, it's a claim of

8    only several months.  That's what we have here.  That is what

9    our argument will be.

10          THE COURT:  Mr. Lieberman, I will give you an

11   opportunity.  Obviously, Mr. Kramer has characterized the

12   complaint in one way.  Basically, the dispute between -- again,

13   I am not saying that -- I am using the words the dispute

14   between the two experts Snowden and Strathcona.  Is there

15   something more in there that you believe the complaint

16   contains?

17          MR. LIEBERMAN:  Well, your Honor, there's also

18   allegations that even as early as November 2012, Snowden when

19   they had published their initial estimate report, that there

20   actually was the use of something called a Kriging method where

21   that use actually artificially inflated the amount of reserves

22   that were available, and, actually, your Honor, that's

23   ultimately what happened.  Even Snowden itself has admitted

24   that they don't have in that mine what they thought there was,

25   and there's certain -- of the key veins in that mine, your

E4nQpreC

1    Honor, there are certain that are economically unfeasible.  So,

2    the class period starts in our view, your Honor November 2012.

3    I think what's key is that we're talking about a dispute of

4    experts, as it were.

5           I think actually if you look at what Mr. Kramer said,

6    is that the preliminary estimate is done by Snowden.  In

7    effect, thereafter, Strathcona takes the role as an auditor,

8    your Honor.  They are the ones who are ultimately going to

9    audit these financials, and ultimately they are going to be the

10   ones that sign on to it.

11          What you have here, your Honor, is throughout the

12   period, you have Strathcona saying, hey, the numbers you're

13   giving out here, which they consistently say, here is a certain

14   sample, and this sample confirms the initial report, hey, the

15   numbers out here are not confirming the report.  Your numbers

16   are -- as it were, to take it, the way you're crunching the

17   numbers here is inaccurate.  You're going to come out with

18   ultimately numbers that do not substantiate what you've got.

19          So, it's tantamount, your Honor, we believe to have an

20   auditor at each quarter, your Honor, to say, hey, you know, you

21   guys are not calculating your financials properly ultimately,

22   and that there was a false statement.

23          So, there's a duty that arises each time you make

24   those statements is a duty to say -- had they said, these are

25   our numbers, our auditor, or here, Strathcona, where they

E4nQpreC

repeatedly in each statement, they said, they're doing the --

they're overseeing this process for us, they disagree with

these numbers.  They actually think we don't have the -- we

don't have an economically feasible mine here.  Had they said

that, there likely would not be a case, your Honor.  But the

failure to disclose that dispute while pumping and promoting

the viability of this mine does lie at the crux of this case.

THE COURT:  I have some follow-up questions.  First

with regard to the period -- because the dispute couldn't have

arise until after Strathcona is retained.  January, right?

There's probably a time period, and I don't know -- there's not

alleged in the complaint sort of when exactly it started.  So

Mr. Kramer's point was May or June.  Let's get back to the

November time period and the use of the Kriging, Multiple

Indicator Kreiging, whatever that is.

MR. LIEBERMAN:  Yes.

THE COURT:  Just with regard to the factual

allegations related to that, I just want to understand that

because the complaint says in paragraph 42, that it's the

statistical methodology and that it's considered non-standard

and challenging to apply, but that it appears in that same

sentence to indicate that it is a methodology that's used.

Then it also says it's used, and then it says, estimates for

operating mines.

So, my first question is, was that just a term that

E4nQpreC

1  was used in the complaint?  In other words, my understanding of

2  this mine is that it wasn't an operating mine; and if it was

3  term that was specifically put in there because there's a

4  difference between using this methodology for an operating mine

5  as opposed to a mine that is preoperational, in other words, I

6  would say pre-commercial -- and I may be reading too much into

7  this -- is there a difference between the way that this

8  methodology is viewed for an operational mine as opposed to one

9  where they're basically doing, I'll use the term exploration,

10 although that's not the correct term.  It's more of a factual

11 question.  You may not know the answer to this.

12       MR. LIEBERMAN:  Your Honor, I think the crux of it was

13 based on our discussions with experts and also analysts'

14 feedback that this Kriging methodology was not -- when you're

15 doing estimates for the capacity of a mine and their reserves,

16 this was not a standard method to use.  So, operating versus --

17 making that distinction, I am not -- it could be we -- it could

18 be that's something that we got from our expert.  I don't know

19 the answer to that offhand.

20       THE COURT:  Sure.  Focusing on that, because my

21 understanding is you're not alleging that it's something, in

22 other words, that is outside the pale.  In other words, it's

23 non-standard.  It's used.  Maybe not used that often.  I don't

24 know necessarily what percentage to put on it, but it's not a

25 methodology that is never used and, in fact, disfavored or

E4nQpreC

1   something like that.

2           The point I am getting at goes to with regard to that

3   statement, I don't see a scienter, the other side of it, the

4   scienter side of it.  In other words, I don't see in the

5   complaint a statement that at a particular point in time -- at

6   almost any particular point in time, but even in the November,

7   December, January time period, that the defendants, either the

8   company itself or the individuals, had in their mind -- again,

9   whether it's the standard that Mr. Kramer was saying that it

10  was actually false or whether it's a reckless standard,

11  something less, I don't see an allegation in the complaint with

12  regard to that during that time period or even later because I

13  don't -- while Strathcona -- well, I will leave it at that.

14          I guess what I am looking for is within that time

15  period, as I understand the law, if this is supposed to be

16  their use of it is something that was improper and you're

17  alleging it was false because of the numbers they were putting

18  out, then there should be on the other side of it some scienter

19  allegation.  I don't see that here.

20          MR. LIEBERMAN:  Your Honor, we would argue that

21  defendants were aware that this methodology was unconventional;

22  that it did have the -- that it did have the impact of

23  inflating the quarter reserves and the viability of the mine,

24  and, therefore, when you make disclosures regarding the results

25  of that report, that it has to be properly vetted to investors,

1    and investors have to be apprized of what the risks are.

2              And we look at it also, your Honor, a little more

3    holistically, from the beginning of the class period through

4    the end that there is an effort really, your Honor, to -- the

5    company is -- their financial liability lies on this mine's

6    financial viability and the ability to economically feasibly

7    mine this area, and the inability to -- so, given that motive,

8    your Honor, we believe it starts from the beginning of the

9    class period through the end there's an effort to -- in order

10   to raise capital, in order to keep investor interest, in order

11   to explain to the market why there is this company called

12   Pretium that there is an effort to mislead investors.

13             THE COURT:  I understand the motivation argument, but

14   are you saying the statement plus the motivation -- because

15   there's no allegation -- and, again, I don't know that Pretium

16   or the individual defendants understood what you say in

17   paragraph 42; that the methodology was non-standard.  Even to

18   the point of saying that it's -- I'm not saying whether this

19   was sufficient or not, but it's common knowledge in the

20   industry that this methodology is something that is

21   non-standard and, therefore, not used, or something like that.

22             What I am trying to get at is for purposes of the

23   motion to dismiss, looking at just the complaint, I am trying

24   to find that scienter point.  While I understand the motive

25   argument, in my mind I don't think it quite gets you there

E4nQpreC

1  inferentially with the way it's pled at this point in time

2  because I think, and you can correct me, from the November time

3  period until -- obviously they release periodically projections

4  between the November time period going forward, I guess,

5  through when Strathcona is retained; but am I correct that the

6  main allegation as it relates to that time period is that they

7  were utilizing methodology that was non-standard, was

8  challenging to apply and that, to use your terminology, was

9  basically turning out inflated numbers?

10       MR. LIEBERMAN:  Your Honor, yes, the use of that

11  methodology, as well as just the publication of inflated

12  numbers, your Honor, those two twin allegations.

13       THE COURT:  Let me ask you again.  This is just by

14  what the words were in the complaint with regard to this.  What

15  was the meaning behind challenging to apply?  What does that

16  mean?  In other words, I understand non-standard in the sense

17  that it means to the extent that it's used in the industry,

18  it's only used in five percent, ten percent, 20 percent, what

19  is less than majority or even more than that.  I was just

20  wondering "what challenging to apply" meant?  Is it just from

21  the perspective of the expert that it's very complicated and

22  difficult to utilize?  I just didn't understand that.  What

23  does that mean?

24       MR. LIEBERMAN:  Your Honor, and I think because we

25  have a transcript here running, so I don't want to misstate

E4nQpreC

```
1    matters and assume that we can go back and correct it, so with

2    all those caveats, your Honor, the way we understand it, the

3    Kriging method does apply methodology where they take certain

4    spot samples in certain areas and they basically extrapolate.

5    They'll take a certain area, and they'll go a distance out and

6    take another area and see what the deposits are there, your

7    Honor, and there's an extrapolation of, well, because we got

8    this here and this here, we'll make certain assessments

9    regarding what's in between those, your Honor.  We understand

10   there's usually -- in other methodologies, there's less

11   extrapolation and more actually digging into those areas to get

12   samples as to what actually occurred.

13         So that is my understanding as to either why (A) it's

14   both difficult to apply, and (B) as to how it has the impact of

15   inflating numbers, but, your Honor, we would prefer to have the

16   benefit of vetting that.

17         THE COURT:  No, that's fine.  As I said at the outset,

18   I completely understand that you don't necessarily have all the

19   facts at your fingertips and that that's going to await

20   briefing.  This is really for me to now start getting my mind

21   around sort of what the motion may look like and also to give

22   you an opportunity to get a sense of where I have questions.

23         Is it fair to say that the statements that relate to

24   the projections and otherwise, do you dispute that those

25   statements are forward looking?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E4nQpreC

1          MR. LIEBERMAN:  No, your Honor, we would dispute -- it

2     also depends which statements we're discussing.

3          THE COURT:  Correct, I understand.

4          MR. LIEBERMAN:  We would dispute they're forward

5     looking because, your Honor -- a statement is not forward

6     looking if it's a statement of historical fact.  What Pretium

7     is doing is from the beginning of the class period through the

8     end of the class period, whether it's their initial resource

9     report or statements made from May onward, your Honor, they say

10    this is our sample, this is what we've got, and this confirms

11    our prior reports.

12          Nothing about that, your Honor, is forward looking.

13    It's actually historical.  This is what we've received, and it

14    confirms the prior report.

15          So, therefore, we would argue that the statements are

16    not forward looking.  And even if they were, your Honor, the

17    standard is that a forward-looking statement does have to have

18    proper cautionary language attached to it, and the proper

19    cautionary language here would be very specific.  Your Honor,

20    our independent expert does not believe that these numbers

21    support our initial report, and they believe that actually this

22    mine is not economically viable.

23          Your Honor, had that statement been made throughout

24    the class period, and certainly from May onward, had that

25    cautionary language been utilized, your Honor, it may be a

E4nQpreC

1    different case.  But that's not the case, your Honor.

2            So, (A) we don't believe these are statements of

3    historical fact.  (B) the cautionary language here really did

4    nothing to alert investors to the true risk of the numbers that

5    were being presented.

6            THE COURT:  I thing there are two -- and I appreciate

7    that, and I appreciate your saying from May onward because

8    until Strathcona is there -- I assume that's the independent

9    expert you're referring to, is Strathcona?

10           MR. LIEBERMAN:  Yes.

11           THE COURT:  And they weren't retained until January.

12           MR. LIEBERMAN:  That's correct.

13           THE COURT:  So, even if Strathcona initially when they

14   signed the retention agreement started basically calling into

15   question the model, and there are no allegations in the

16   complaint as to that, that would at least mean it's not until

17   January where you have this sort of change, as it were.

18           Let me ask this:  Assuming that the statements have

19   these nuggets of facts in them, so you're alleging they're not

20   forward looking, wouldn't they still be opinions?

21           MR. LIEBERMAN:  Your Honor, would they be opinions?

22   Your Honor, when you're saying "this is the amount of gold

23   we've received," that's not an opinion.

24           THE COURT:  But you're not disputing that that

25   statement is false?  In other words, you're saying that

E4nQpreC

1      statement may be true, but the extrapolation that is done

2      because of that using this model, at least as I understand it,

3      is where you're saying the falsity of the statement comes in.

4      And, again, this is something for you to address more fully in

5      the papers.  I guess what I am asking this:  Do the factual

6      nuggets also take the statement in addition to -- if you're

7      correct on the law, taking it out of the realm of forward

8      looking, does it also take it out of the realm of being an

9      opinion.

10             MR. LIEBERMAN:  Your Honor, it is our position we do

11     believe that these are not opinions.  These are statements

12     being made saying this is what we received and this comports

13     with prior reports.  These are very historical refined

14     statements made to investors.  Even if it were, your Honor,

15     statements of opinion, these opinions have to be believed by

16     the issuer of those statements, your Honor.  And also if there

17     are serious risks in that opinion, they have to be relayed to

18     investors.

19             So when you have very concretized opinions, there is a

20     standard to weigh whether or not there -- their investors were

21     probably warned this is just an opinion or there is really

22     information to give -- and all of this, your Honor is about

23     true transparency to the market and was -- when they were

24     issuing these numbers, was there true transparency to the

25     market?  Your Honor, the allegations here we believe could

E4nQpreC

1    support conclusively, these were not.

2              THE COURT:  Let me give you my sort of preliminary

3    view about -- and, believe me, I'm willing to be convinced

4    otherwise, but if it's an expert, and the expert is provided

5    with projections, in my mind, unless there is some reason to

6    take it out of that realm, and it may be the fact that the

7    statements themselves are so intermingled with current facts

8    that it takes it out of this realm, I don't know, but they seem

9    to be almost by definition opinions because how could they be

10   anything other than that?

11             That is sort of where my thinking is on this.  This

12   is, again, only with looking at the complaint for purposes of

13   today, which is really just reading through it once and looking

14   at some of the case law, but that is an issue I would like both

15   parties to look at and address.

16             MR. LIEBERMAN:  That's fine, your Honor, but, again,

17   it would be our position if it is an opinion, certainly the

18   basis for these opinions and the proper caution to these

19   opinions here is that there is a serious risk to the basis for

20   these opinions that the expert who is ultimately going to be

21   asked to sign on to these opinions is actually expressing a

22   contrary opinion, your Honor, contemporaneously, your Honor, we

23   think there would be no case law to support protecting such

24   statements.

25             THE COURT:  I think we have dealt with sort of the

E4nQpreC

1    November 2012 time period.  I don't see the scienter allegation

2    in there with regard to the use of the methodology.  It seems

3    to me that that allegation -- is there anything other than,

4    again, use of the methodology up through the time that

5    Strathcona is retained as an expert -- and I understand that

6    during that time period they are disclosing projections and

7    other information, but as I read the complaint, what are the

8    other, I guess, places of -- because all of the projections I

9    think are based upon the Snowden use of the model.  I don't see

10   the scienter allegations with regard to the defendants from

11   that November time period.  I will do it in a more informal

12   allegations.  Where are the scienter allegations in the

13   complaint from that November time period through the time

14   period of January?  Let's start with that time period.

15            MR. LIEBERMAN:  Your Honor, I think other than what

16   we've covered and briefly the fact that it was based on the

17   methodology, your Honor, that was known to inflate numbers,

18   your Honor, and was known not to be a customary use.  Based on

19   the motive, because motive does such on scienter, motive of the

20   company to produce inflated numbers because if the company did

21   not produce numbers that showed this model was economically

22   feasible, Pretium would have no value, your Honor.  Those are

23   the crux -- and publishing, generally, the scheme, your Honor,

24   from the beginning of the class period through the end, your

25   Honor, the scheme to publish false numbers and to consistently

E4nQpreC

1   promote them, your Honor, viewed, holistically, those are the

2   basis for those numbers.  I don't have more to add at this

3   point.

4           THE COURT:  OK.  Mr. Lieberman, I will ask first with

5   regard to the complaint, and you may not know the second half

6   of the question, but when did someone from Snowden first begin

7   to raise issues about the projections?

8           MR. ROSEN:  Someone from Strathcona, you mean?

9           THE COURT:  Someone from Strathcona.

10          MR. LIEBERMAN:  Your Honor, to give a precise date, we

11  don't have that at the moment, your Honor.  It's really a

12  matter of an inference, and we do believe the inference --

13  because Strathcona's is a pretty blunt and straightforward

14  assessment that they did not believe that this -- that there

15  was never a point that they believed that the mine had the

16  ability to be economically feasible, your Honor.  So that's one

17  point.

18          THE COURT:  Let me stop you.  With that last point,

19  are you saying that from the time they were retained in

20  January, that it's your understanding they expressed the view

21  that the mine wouldn't be as commercially viable as the

22  statements that the company was making?

23          MR. LIEBERMAN:  Your Honor, certainly from when they

24  started reporting the samples -- and the question is whether or

25  not these samples do confirm or do not confirm Snowden's 2012

E4nQpreC

```
 1   report -- the opinion of Strathcona from reading the article,

 2   your Honor, we do believe in the case that they knew from the

 3   outset they didn't believe this was economically feasible, and

 4   they were consistently telling them to advise investors that

 5   this was the case.

 6           Your Honor, there is certainly a point where

 7   Strathcona is obviously telling them we think you're giving

 8   false numbers to investors.  Actually, what they say, your

 9   Honor, is at the end of the class period, they say, all the

10   numbers that have been issued in the class period have been

11   false.  That's a statement by Strathcona at the end of the

12   class period.

13           THE COURT:  Do they actually say false?

14           MR. LIEBERMAN:  You know what, let's not use me as the

15   basis, your Honor.

16           MR. ROSEN:  Misleading I believe so.

17           MR. KEHOE:  Paragraph 60.

18           THE COURT:  Erroneous and misleading.  I see what

19   you're saying.

20           MR. LIEBERMAN:  Statements include in all recent press

21   releases about the probable mineral reserves and future gold

22   production and the Value of Kings zone over a 22-year mine life

23   are erroneous and misleading.

24           Your Honor, the context for that statement is what we

25   learned after the class period from the interview with the
```

E4nQpreC

1    Strathcona person, the CEO of Strathcona, was they were telling

2    them that at several points during the class period, come clean

3    with investors.  You have to tell the world.

4             THE COURT:  Let me ask this:  So, you interviewed

5    Mr. Farquharson, or however you pronounce it?

6             MR. LIEBERMAN:  I didn't interview him.  There was an

7    article.

8             THE COURT:  It was just the article.  I was going to

9    ask whether you interviewed him.

10            MR. LIEBERMAN:  We haven't had -- not yet, your Honor.

11            THE COURT:  I assume there was a contract with the

12   company, and so there may be a reason why that couldn't happen?

13   Do you know?  I don't know whether that's the case, but, you

14   know, contractually he may not be able to do that absent

15   consent from his former client, but I'm just in part wondering

16   because obviously while an article is very helpful, speaking to

17   him would be something different.  I understand that is

18   something you have not to date been able to do.

19            MR. LIEBERMAN:  Your Honor, we have been unable to

20   interview Farquharson at this stage.

21            THE COURT:  In other words, because you have tried and

22   been unable to?  In other words, he hadn't agreed to interview

23   with you or you haven't tried?

24            MR. LIEBERMAN:  Your Honor, for the purposes of

25   stating on the record, we have not interviewed him.  I don't

E4nQpreC

1     want to say anything further.

2                 THE COURT:  OK.  Again, I don't want to go too far

3     afield.  Sometime my curiosity gets the best of me.

4                 MR. LIEBERMAN:  There is certainly a point, your

5     Honor, in August of 2013 where Pretium changes the course of

6     how they're going to do their drilling and sampling.

7     Basically, what it has learned is that they find the Cleopatra

8     vein, and they decide, hey, we've got some good stuff here,

9     let's drill down.  That was not the initial plan, your Honor.

10    They say, let's continue to drill down.  What they say is that

11    Strathcona was on board with that change, with that change in

12    the drilling plan.  So Strathcona though reveals that it was

13    never on board.  They didn't agree with that and ultimately

14    they didn't agree with the whole process.

15                So, certainly you have at that point where that change

16    is made, a statement is made that Strathcona is on board with

17    that change in plan, and Strathcona's ultimate clarification

18    that they were never on board with it, you are certainly

19    getting by August 1 a critical period where there is certainly

20    knowledge, but we think, your Honor, the inference is that it

21    starts from the beginning of the period -- with respect to

22    Strathcona's objections, certainly by May when they start to

23    issue the initial results and say that it supports the Snowden

24    report of 2012.

25                THE COURT:  I see that with regard to the Strathcona

E4nQpreC

statements that you can draw an inference that at some point at
that point, and I assume you are saying at the point when they
resign or some point before that, that they started raising
these issues; that as they're heading out the door, they send
them a letter which, I guess, probably outlines some of the
things that are contained in paragraph 60.

I can see where you can argue that there is an
inference that, therefore, the defendants knew that the
statements were false inferentially.  I don't think that is
explicitly stated in the complaint that based upon these
statements, you can infer that.  It certainly doesn't say a
warning that they were reckless, whatever the standard is.  It
may be that the inference is all that's necessary, you know, in
that time period.

MR. LIEBERMAN:  Your Honor, we have a statement saying
we told them on several occasions they should be alerting the
world the resource model is not panning out.

So, there is a period, your Honor, where obviously it
has to not pan out before that conclusion has arisen.  I think
the inference is certainly the case that there's a reason why
Pretium decides to change the course of their bulk sampling
program and dig deep down in Cleopatra.  Strathcona discusses
that that was a change that was made, and certainly by that
stage and before that stage, they realize, hey, if we don't do
that, we're not going to get good results in our bulk sample

E4nQpreC

1    report.  The only way we can do that is by drilling down.

2            So, your Honor, I think that is an inference that

3    there is a change.  The fact is we don't know when Strathcona

4    started saying alert the world.  The question is when does that

5    inference apply, your Honor?  Strathcona is so forceful in its

6    statements after the class period, bot in its resignation and

7    its subsequent interview by Farquharson, it was a pretty strong

8    opinion that it was never panning out, your Honor.  So, we

9    believe those statements are coming out false from the outset

10   or certainly from the time results are being made.

11           There is a reason why, your Honor, the plan of the

12   bulk sampling drilling changes.  So, the question is, how does

13   that fit into the pleading?  What is the inference?  We think

14   the inference is that the theme is that they weren't getting

15   the numbers, they weren't disclosing that to investors, and

16   they decided, hey, we'd better drill down to get something to

17   justify the feasibility of this mine.

18           THE COURT:  Let me ask this, and this is for both

19   parties, I think.

20           Does it matter here from a legal standpoint that what

21   you have is one expert using the model saying here are the

22   projections.  You have another expert saying, well, no, we're

23   seeing these samples, and you know what, we don't agree with

24   that.  We think that's wrong.

25           For the purposes of determining sort of the

E4nQpreC

1    defendant's state of mind at the time -- I guess what I am

2    asking is, are there cases where you have this situation where

3    you have experts on either side, you have the defendant hearing

4    from both experts, and where that leads me as I'm looking at

5    the allegations in a complaint on a motion to dismiss or even

6    outside of that.  Because I'd like to see cases that -- because

7    I won't say this is an unusual, but it's a unique case where

8    you have a situation where the -- because although I understand

9    your motive argument, right, and it may be that there's a

10   requirement that they get another expert to come in, but

11   they've brought Strathcona into the mix, right?  And as you

12   mention, certainly the principal of Strathcona seems to be

13   someone who is pretty plain-spoken and pretty direct, at least

14   in his interview, right?  So, if they knew that going in and

15   they hire him nonetheless?

16           In other words, what I'm saying is your motive

17   argument is based on the fact that they had an idea using this

18   methodology that it would inflate the numbers, but then they

19   bring somebody in who apparently can debunk that.  So it's a

20   little bit of a counterargument what their motive is.  In other

21   words, that doesn't seem to make sense if their motive was to

22   inflate them.

23           MR. LIEBERMAN:  I think, your Honor, we would take

24   issue with the characterization this is just to dueling

25   experts.  What happens is certainly by January 2013, there's

E4nQpreC

1    only one expert, your Honor.  That expert is Strathcona.  That

2    expert is going to be the one that issues the report, the final

3    report, that tells investors what they have here; and that is

4    going to be the report that confirms the 2012 report.

5            You're not going -- ideally, they wouldn't have

6    Snowden go ahead and confirm their own report because there's a

7    certain element of bias there.  So they hire an independent

8    expert.  They taut that expert throughout the period.  So, from

9    the period of when Strathcona comes in, there's only one

10   expert, your Honor.  That's Strathcona.

11           So, it's not just that, well, we have dueling experts,

12   and I take this expert's opinion over this expert's opinion.

13   That's an incorrect, your Honor, respectfully,

14   characterization.  There's one expert.  That expert is telling

15   you, this mine is not economically feasible.

16           So, that's a very important point, your Honor, when

17   they're telling investors that this is what we have and it's

18   confirming the Snowden report.  Then they're saying in the next

19   sentence, your Honor, and, by the way, Strathcona is the one

20   that is overseeing this program, and they are going to be the

21   ones that sign on to the report, your Honor.  Your Honor,

22   that's a false statement.  That's giving investors a false

23   impression as to the nature of what's in the mine.

24           Importantly, when they make a statement in August 2013

25   Strathcona is on board with the change of the plan of the

E4nQpreC

1    drilling, your Honor, that's incorrect.  That's completely

2    factually incorrect.  They were never on board.  The only

3    reason they continued to go down is because they weren't

4    getting the numbers, and they had Strathcona there, an expert,

5    their only expert, is tantamount to having your only auditor

6    say the books here, you do not have the revenues you think you

7    have.  Stop reporting these incorrect revenues.  That's what we

8    have here.

9            I'm not sure we have dueling experts.  Snowden is

10   supposed go into the background, your Honor, but they never do

11   go into the background ultimately they've got to pull them in

12   at the end of the day.  Significantly, your Honor, at the end

13   of the class period, those numbers turn out to be -- Snowden's

14   numbers turn out to be far less than actually was initially

15   published.  So even Snowden had to back off.  You don't have

16   dueling experts throughout the class the period.  Snowden

17   itself admits, hey, these numbers are lower.  The grades are

18   lower.  The grades on three of the key five veins are

19   economically unfeasible, your Honor.  And they're less than

20   five grams per ton, and at 20 percent less than was announced

21   by Pretium.

22           So, your Honor, I don't think we have dueling experts

23   here.  Actually, what you have is, you have an expert that did

24   is the task, and supposedly had left the scene.  Strathcona

25   comes in and never signs on and says these numbers are false.

E4nQpreC

1    They're not supporting numbers.  This is economically

2    unfeasible, and ultimately you have that same expert saying,

3    you know what?  Strathcona was right.  Your Honor I don't see

4    dueling experts I see one expert that turned out to be right,

5    Strathcona, and only one voice over the relevant period, your

6    Honor.

7               THE COURT:  I'll hear from Mr. Kramer.

8               MR. KRAMER:  Thank you, your Honor.

9               Your Honor, none of that is in the complaint because

10   he couldn't allege it consistent with Rule 11.  Snowden is the

11   only expert responsible for the estimate.  Snowden is the

12   expert that remained on the scene throughout the entire period,

13   and Snowden is the expert that remains with the company to this

14   day.  So, the notion that Snowden has somehow left the scene is

15   not a fact that they could allege consistent with Rule 11.

16   It's just not true.

17              Strathcona came in for a bulk sample project, and you

18   did have dueling experts.  Strathcona to this day stands behind

19   its resource expert to this day and has not backed away.  You

20   are right, it is an interesting case where you have one expert

21   responsible for an estimate continuing to this day to say I

22   gave the right estimate and have another expert who came in to

23   do a bulk sample saying we think their methodology is wrong.

24   You have a company who has to figure out which one to go with.

25   It's simply not a securities fraud case when you have those

E4nQpreC

factors.

         If you think of Twombly, the Supreme Court's decision
in Twombly where the Supreme Court said, you have to have not
only a plausible theory of the case, but your theory of the
case has to be more plausible than the other guy's theory.
Here, I submit, where you have the expert responsible for the
estimate continuing to this day to say this is a valid
estimate, it's very, very hard to allege that the defendants
not only knew the estimate was wrong because there's no facts
here to show it was wrong, but that they believed it was wrong
at the time they made the statements.

         I think your Honor questions are exactly right, where
in the complaint, which has to be pled with specificity, do
they allege, this is the first time that the defendants knew or
were told by Strathcona that Strathcona disagreed with the
resource estimate?  It's not in the complaint, and it's not in
the complaint for a good reason, because Strathcona didn't even
start the work that led to the disagreement until May 28,
drilled the first hole.  Strathcona didn't get the first
results until sometime thereafter, and it's only that set of
facts that led to the disagreement.  And even then to say that
the defendants must therefore go with the expert that disagreed
with your principal expert, OK, they have a disagreement,
that's fine.  That's not fraud.  These far from fraud.

         So, I think the questions are correct:  Where in the

E4nQpreC

complaint is there a factual allegation that my clients were on

notice that Strathcona disagreed, and even then what you have

is a disagreement; you don't have knowledge of objective or

subjective falsity.  I think that is a large part what the

motion is going to be about.

THE COURT:  OK.  Mr. Lieberman, I have a question, and

it may be that Strathcona has never opined on this.  It relates

to the actual model itself that was referenced in paragraph 42.

I didn't see anything in the complaint, but did

Strathcona either in the complaint or otherwise, in

statements, take issue with the methodology before they had

started doing the sampling?  In other words, you could imagine

a situation -- and this is me, again, just talking -- where

they get retained.  They say can you provide us with the

information that the other expert has put together, and they

look at this model, and they say, how could you guys possibly

use this model?  This doesn't make any sense.  What I'm trying

to do is get at the use of the model.  Do you have any sense

that at some point Strathcona or someone else expressed that

view and actually expressed that view to the defendants?  The

first part is what I'm interested in, but either, you know, if

yes, then do you have any idea whether they expressed that view

to the defendants?

MR. LIEBERMAN:  Your Honor, the allegation comes from

any discussion with our expert, your Honor, and also from the

E4nQpreC

Farquharson's interview which comes after the class period.

The claim, your Honor, the allegation is that given that you, Pretium, are the experts, they are certainly a company that focuses on mining and they understand what the difference between the Kriging method is and other method is, and they understand the consequences of using that, your Honor, and using a method that is not standard industry use.  So that is, your Honor, the basis.

We don't have, your Honor, an allegation saying that Strathcona told them at X point, no, you should not have used Kriging.  That allegation is not in the complaint.

THE COURT:  Then I think as you are putting papers together because I'm not sure -- let's assume that you just add a paragraph, and the paragraph says that it was common knowledge in the industry and, therefore, to these defendants that this was a non-standard methodology.  Does it meet the standard?  In other words, once they use that, is that reckless?  And to Mr. Kramer's point, because I think he is saying these opinions are forward looking and the standard is higher, so you have to either show objective and subjective falsity or you have to show that there was a belief that use of this basically was creating false information or false results.

I guess what I am saying is that if there is that sort of information out there either because I understand the argument that Strathcona came in, they did the sampling and

E4nQpreC

1    they said, you know -- this is me talking, they may have said

2    it in a different way -- these samples do not support the

3    results that Snowden came up with using that model, and I

4    understand that, but that only comes at a certain time period,

5    I guess.

6         My question is whether prior to that you have

7    information that Strathcona questioned the use of the

8    methodology because it was non-standard or something like that,

9    or raised some issues with the defendants about that.

10        MR. LIEBERMAN:  Your Honor, there is currently no

11   allegation as to Strathcona raising the point prior to

12   January -- prior to May regarding the Kriging methodology.  So

13   that's something that if we have something, then we would

14   consider amendment; but, if not, we'll stand on the pleadings.

15        THE COURT:  I want to talk now a little bit about the

16   individual defendants, and then I will move to the issue of

17   allegations relating to damages, which is something I don't

18   think Mr. Kramer necessarily raised in his papers but I want to

19   raise because, again, I don't want to be in a position where we

20   go through everything and then there is an allegation that --

21   in other words, where we do more than one amendment to the

22   complaint.

23        I understand there to be allegations as to the

24   individuals as relates to control, you know, their position,

25   the fact that this apparently was one of or the only project

E4nQpreC

1   that they had.  But doesn't there need to be some allegation of

2   culpable participation or are you arguing that what you've

3   stated here, the combination of their positions and the fact

4   that this was the sole thing they were focused on, that that is

5   sufficient for pleading purposes?

6        MR. LIEBERMAN:  Your Honor, we'd argue that when you

7   have a situation where the company's entire viability relies on

8   results coming out of this mine and this bulk sampling report,

9   this is a most significant matter for the company.  The

10   allegation is that Strathcona was raising issues, was alerting

11   them that the numbers they were advising investors and that the

12   sampling did confirm the 2012 report, and that was the

13   entire -- that was the entire import of the company, your

14   Honor.  We had those statements, your Honor made by -- we had

15   the executives of the company, the CEO, the CFO, people who

16   were involved in the operations, your Honor, we would say

17   there's no way they are not aware of those concerns being

18   raised by Strathcona.  The only plausible inference, your

19   Honor, would be is that they were advised of those concerns and

20   understood what concerns ultimately led to Strathcona's

21   resignation.

22        THE COURT:  I think I have a couple of points with

23   regard to the briefing.  Are there any cases where that is sort

24   of enough?  In other words, where you have a situation where

25   either it's the only thing the company does or they've been

E4nQpreC

 1    tasked to look after that particular project, so, similar to

 2    the defendants here, and that combination has been found to

 3    amount at any point in time to either a motion to dismiss,

 4    motion for summary judgment, what have you, to culpable

 5    participation for those individuals?

 6         MR. LIEBERMAN:  Your Honor, we would argue it's not

 7    only culpable participation, but it's even for a primary

 8    violation, your Honor, it does lead to scienter.  We do not

 9    believe the Second Circuit requires that we have a verbatim

10    quote from Strathcona to Mr. Quartermain saying your numbers

11    don't match.  There's an inference of plausibility that goes,

12    your Honor, quite frankly, both ways.  It's implausible that

13    Quartermain and the CFO did not know that Strathcona was

14    raising issues regarding the viability, the economic

15    feasibility of company's only mine.

16         THE COURT:  With that, again, I've looked at some of

17    the cases, but does the actual culpability need to be more

18    individualized than that?  I am not saying it necessarily

19    would, but you could imagine a situation where you have these

20    press releases, but also concurrent with that or certainly

21    after that, you have the president answering questions of

22    analysts or something like that, so you have the actual

23    statements of that individual as evidence of their

24    participation.  That may be the cleanest, or there may be other

25    gradations, and I do understand that even in this district when

E4nQpreC

1    it comes to culpable participation, there may not be a hundred

2    percent agreement among the other judges concerning that, but I

3    want you to explore that.

4         And you know what?  To the extent that you feel that

5    there are cases even outside of this district that speak to it

6    because you can't find something directly on point here, I

7    would invite both parties to look to that because this is an

8    area that I think -- my sense is that it is not as well settled

9    as some of the other things that we have been talking about.

10   Again, that is my sense at this point without having really

11   jumped in with both feet on this.

12        Now, damages.  What's the theory of damages here?  By

13   that I am saying, is loss causation based on corrective

14   disclosure materialization of a risk?  What actually is the

15   theory under which you are pursuing the loss here, the damages?

16        MR. LIEBERMAN:  Your Honor, both, your Honor, we think

17   the resignation of Strathcona certainly causes the stock price

18   to drop on October 9, 2013, your Honor.  We think that is

19   certainly materialization of the risk that Strathcona all along

20   believed that the numbers of the representations made by the

21   company was false and they ultimately say two weeks later that

22   is why they resigned.  Ultimately, also in October of 2013 when

23   they resigned, they say all of the prior press releases of the

24   company were false, and, your Honor, that's a disclosure.

25   Falsity of the stock thereafter also was dropped, your Honor.

E4nQpreC

1          So, your Honor, really if you think of an analyst's

2     understanding of this information and also how scholars -- and,

3     you know, the difference between materialization of risk and an

4     actual corrective disclosure is a very fine line, your Honor.

5     It's really marketing -- learning information that it hadn't

6     known otherwise, your Honor, and that occurs in both instances,

7     both of the alleged partial corrective disclosures.

8          THE COURT:  I would say just in what I was thinking

9     about this before coming on the bench, the resignation, I don't

10    see quite how that is necessarily a corrective disclosure

11    because there is no -- in other words, with regard to the false

12    statements that you've alleged, it's not connected necessarily

13    to that, and I at least saw one case where there was a

14    resignation by board members, I think -- and I think it was an

15    allegation of corrective disclosure where the allegation was,

16    well, that's not enough.  It doesn't go to what the underlying

17    falsities were which related to something like accounting

18    improprieties or something like that.

19         I would like when you look at it -- you know, you

20    didn't say that for loss causation.  You mentioned it in

21    materialization of the risk.  I would like to see cases,

22    actually, because I had a spirited conversation with my law

23    clerk before we came out about this issue, about whether the

24    resignation is something that would fall within materialization

25    of the risk.  And, in fairness, I didn't look at enough cases

E4nQpreC

```
 1 │ to get a sense of that at all.  So, when you -- I trust that
 2 │ since I'm raising it out now, Mr. Kramer will raise the issue
 3 │ in his papers.
 4 │           MR. KRAMER:  We will, your Honor, yes.
 5 │           THE COURT:  In part because I really do want to, you
 6 │ know, if there is going to be an amendment, to take care of
 7 │ everything at once.
 8 │           I do understand, actually, Mr. Lieberman, the comment
 9 │ about the statements later because you have to understand that
10 │ the statements you have that are made by Strathcona in the
11 │ article are actually outside the class period, but as I
12 │ understand what you're saying is that those statements, you can
13 │ basically infer that they, being defendants, were told about
14 │ each of those things during the class period, basically.
15 │           So, I think the class period ends on the 21st.  The
16 │ statements are on the 22nd.  But I understand what you're
17 │ saying, I think, is that that goes to -- you know, clearly that
18 │ the defendants knew because Strathcona basically said in the
19 │ statements we told them repeatedly before this.
20 │           MR. LIEBERMAN:  Right.  I mean, your Honor, the
21 │ October 22, 2013 statement regarding falsity bears directly on
22 │ the resignation letter of October 9, 2013 when they resign.
23 │ So, to somehow -- that these are two separate instances or one
24 │ is a corrective disclosure and one is not, your Honor, they
25 │ bear directly on the method, your Honor.  First, they resign
```

E4nQpreC

1    and then Pretium decides to disclose why they resigned, your

2    Honor, it's similar to -- and there are certainly cases, your

3    Honor, that have held that a resignation or a resignation

4    here -- it could be of an auditor, it could be a resignation of

5    a CEO, a resignation of any type of personnel -- can be the

6    first time that that is alerted that there's something wrong,

7    and that get baked into the stock price, your Honor, and it

8    thereafter comes out -- typically disclosures don't come, your

9    Honor, in one full clean -- Enron didn't collapse by the CEO

10   getting up and saying our statements have been false for the

11   past eight years.  There's a series of disclosures at several

12   times, your Honor, and that's the same thing that occurred

13   here.

14           THE COURT:  Although it was a pretty dramatic collapse

15   for the employees themselves.

16           MR. LIEBERMAN:  It certainly was, your Honor, but it

17   didn't occur from one statement.

18           THE COURT:  From one day, that's correct.

19           I think that's all the questions that I have.  I will

20   give both parties an opportunity to raise any issues they want

21   to raise to me now and then we can discuss -- I don't know

22   whether you've discussed with each other a schedule for

23   briefing.  If you would like to take a few minutes to do that

24   and then propose something, that's fine.  If you've done it

25   already, I'll hear from you.

E4nQpreC

1          MR. KRAMER:  Your Honor, in fact, we had a schedule

2     with Judge Gardephe that then it came to your Honor, and you

3     revised the schedule to tighten it up a bit.  The current

4     schedule we have, I believe, your Honor, is -- yes, there is a

5     letter dated February 14, 2014 from the Pomerantz law firm.

6     It's filed February 18 with a proposed schedule.  I believe

7     your Honor handwrote different dates on here.  So I will tell

8     you the current dates we have.  We are prepared to move forward

9     on it, and we will obviously try to expedite as much as we can

10    the transcript from today which was very helpful, but the dates

11    we have currently are May 5 for the defendant's brief.  The

12    opposition June 16; and then the reply July 14.

13         THE COURT:  Look, I probably wrote it.  No question I

14    wrote it, but I also raised some issues here today.  So, if the

15    parties want a little more time -- rather than give you more

16    time and you're add able to address this adequately than not,

17    but if that briefing works for the parties, then --

18         MR. LIEBERMAN:  Your Honor, I think in light of the

19    fact that it appears that your Honor is inclined to have this

20    as the last and final, one motion to dismiss to ruled upon, and

21    thereafter not allow for any other amendments, we propose that

22    we give, your Honor, 60 days to respond to the motion to

23    dismiss.  Within that time period, your Honor, we will alert

24    the Court whether we intend to amend or not.

25         THE COURT:  OK.  60 days for defendant to put in their

E4nQpreC

brief?  I'm sorry, I'm not sure I follow.  60 days for the

whole briefing schedule?

        MR. LIEBERMAN:  60 days from the time that we

receive--

        THE COURT:  I see.  For you to be able to respond.

        Mr. Kramer, you heard what Mr. Lieberman wants; he

wants 60 days from the time you file your brief, to either

submit his brief or, as I understand it, to indicate to the

Court an intention to amend.

        And before you say anything, Mr. Kramer, I just want

to make sure that I -- I want to be perfectly clear.  What I am

saying with regard to amendments is that with regard to issues

that Mr. Kramer has raised or I've raised here, that with

regard to those, it would be an uphill battle for you to seek

leave to amend if we go through the motion to dismiss there.

        If there were areas that no one had raised prior to

that, I would obviously entertain the motion, but that's a

different situation where you haven't been put on notice of a

deficiency, and it's something that neither -- that no one has

noticed, I view that in a different place.

        So, I don't want you to think that I would preclude

you.  In fact, I don't want you to think in either situation,

you always have the ability to apply to me to amend.  What I'm

saying to you, the bar is much higher for issues that we sort

of vetted here today.  That's what I'm saying.  I don't want

E4nQpreC

1   you to not then seek leave to amend thinking that I was

2   basically precluding you in some way.

3          MR. LIEBERMAN:  Understood, your Honor.  We would

4   still request the 60 days.

5          THE COURT:  That's fine.

6          MR. KRAMER:  Your Honor, can I then based on this

7   conversation, we would like just a little bit more time because

8   we would like to get the transcript and really focus on your

9   Honor's questions to make sure we have done it.

10          THE COURT:  That's fine.

11          MR. KRAMER:  So, currently our brief is due May 5.  We

12   would propose that it be due May 19, to give us two extra weeks

13   just to go through it.

14          Plaintiffs opposition or amendment, whatever they

15   choose to respond, July 19.  That's two months, if that works.

16          And then our reply, I would propose to be August 21,

17   although I don't know if that is a weekday --

18          THE DEPUTY CLERK:  August 21 is a Thursday.

19          MR. KRAMER:  May 19, July 19, August 21 is what we

20   would propose if that's OK with the Court.

21          THE COURT:  Mr. Lieberman?

22          MR. LIEBERMAN:  That's fine, your Honor.

23          THE COURT:  OK.  Once I get the papers, I will

24   determine whether oral argument is going to be necessary.

25   Basically, the way I envision any oral argument, it will be

E4nQpreC

 1   similar to today.  I will come with questions that I have based

 2   upon the papers.  If possible, if time permits, I will try and

 3   give you some direction before we appear so you can give some

 4   thought to the questions.  I may not be able to do that, but I

 5   will attempt to do that.  So you don't have to come prepared

 6   with a spiel "May it please the Court, yada yada yada."  That's

 7   going to be the first time I'm yada yada will be on the record.

 8   So if that schedule works, we will put that in a minute entry

 9   for today's proceeding.

10          Is there anything else?

11          MR. LIEBERMAN:  Further on behalf of plaintiffs, your

12   Honor, nothing else.

13          MR. KRAMER:  Nothing for defendants, your Honor.

14   Thank you.

15          THE COURT:  I am going to mention something which I

16   don't believe has an impact one way or another, but I do so

17   just to mention it.  When I was in private practice, I believe,

18   Mr. Kramer, we may have been co-counsel on a case.  You

19   probably don't remember.

20          MR. KRAMER:  Now I'm embarrassed.

21          THE COURT:  That's OK.  It was a case involving one of

22   my partners, who was a lead partner, Greg Danilow.

23          MR. KRAMER:  Now I know the case.

24          THE COURT:  I just mention it.  It was, again, I think

25   it was co-counsel, although I don't remember.  This was years

E4nQpreC

1    ago.  I don't believe it requires any basis, but just for

2    purpose of full disclosure, I wanted to let all parties know

3    about it, and to remind Mr. Kramer.

4              MR. KRAMER:  Thank you, your Honor.

5              THE COURT:  If there is nothing else.  We will stand

6    adjourned.

7              (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25