USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _6/13/2017_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                              :

In re PRETIUM RESOURCES INC.          :
SECURITIES LITIGATION               :
                                              :
-------------------------------------------------------X

13-CV-7552 (VSB)

**MEMORANDUM & OPINION**

This Document Relates To: All Actions

Appearances:

Phillip C. Kim
The Rosen Law Firm P.A.
New York, New York

Sara Esther Fuks
Milberg LLP
New York, New York

Jeremy Alan Lieberman
Pomerantz LLP
New York, New York
*Counsel for Lead Plaintiff Pretium Inv. Group*

John Anthony Kehoe
Jonathan K. Levine
Girard Gibbs LLP
New York, New York
*Counsel for Plaintiff Michael Yeo*

Daniel Jonathan Kramer
William Baly Michael
Paul, Weiss, Rifkind, Wharton & Garrison LLP
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

      In this putative class action, lead plaintiffs Gary Martin and Sandra Lee Reyes Troyer,

and plaintiff Michael Yeo (collectively, "Plaintiffs") claim that Defendants Pretium Resources,

Inc. ("Pretium") and three individual Pretium officers—Robert Quartermain, Kenneth

McNaughton, and Peter de Visser—violated Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and the United States Securities

1

and Exchange Commission's corresponding rule, 17 C.F.R. § 240.10b–5 ("Rule 10b–5").

Plaintiffs allege that Pretium and its officers made materially false and misleading statements to

investors. Before me is Defendants' motion to dismiss Plaintiffs' Second Consolidated Amended

Class Action Complaint for failure to state a claim. Because Plaintiffs fail to allege the requisite

scienter needed to plead a claim of securities fraud under the Exchange Act, Defendants' motion

to dismiss is GRANTED.

## I.     **Background**[1]

### A. *Parties*

Pretium is a public company whose shares trade on the New York Stock Exchange

("NYSE"). (SAC ¶ 35.)[2] It is engaged in (among other activities) mining, exploring, and

acquiring gold-bearing properties. (*Id. ¶¶* 50-51.) Its gold production and exploration activities

are primarily in the Americas. (*Id. ¶* 50.)

Lead plaintiff is suing on behalf of a putative class of persons who purchased common

stock of Pretium between June 11, 2013 and October 22, 2013 (the "Class Period"), and retained

such shares until after the Class Period ended. (*Id. ¶¶* 1, 33.) Plaintiffs allege that Pretium's

stock price was artificially inflated during that period as a result of material, uncorrected

misstatements, and that they were damaged as a result.

---

[1] In evaluating a motion to dismiss in a securities action, a court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). For the purpose of resolving this motion to dismiss, I will consider such documents, and I assume all facts pleaded in the second amended complaint to be true, and draw all reasonable inferences in favor of Plaintiffs, *see Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[2] "SAC" refers to the Second Consolidated Amended Class Action Complaint filed on July 23, 2014 ("Second Amended Complaint"). (Doc. 54.)

The three officers whom Plaintiffs have sued are: (1) Robert Quartermain, Pretium's President and CEO, (*id.* ¶ 36); (2) Kenneth McNaughton, Pretium's Vice President and Chief Exploration Officer, (*id.* ¶ 40); and (3) Peter de Visser, Pretium's CFO, (*id.* ¶ 39) (collectively, the "Individual Defendants").

## B. Timeline of Pretium's Brucejack Project

The Brucejack Project is an advanced stage mining and exploration project located in northwestern British Columbia. (*Id.* ¶ 2.) On October 28, 2010, Pretium acquired the Brucejack Project, among other assets, from Silver Standard Resources Inc. (*Id.* ¶ 50.) The Brucejack Project is Pretium's main mineral project. (*Id.* ¶ 2.) In 2012, Pretium began hiring independent expert consultants, known as "Qualified Persons" or "QPs," to develop estimates of the Brucejack Project's potential gold resources. (*See id.* ¶ 5.)[3]

### 1. November 2012 Snowden Report

Pretium hired Snowden Mining Industry Consultants ("Snowden") to prepare mineral resource estimates for the Valley of the Kings zone (the "VOK") of the Brucejack Project in November 2012, which forecast that the VOK contained gold resources of 16.1 million tons at a grade of 16.4 grams per ton ("g/t") and inferred gold resources of 5.4 million tons at a grade of 17.0 g/t. (SAC ¶¶ 4, 54, 57.) Snowden also recommended further test work to confirm the findings of the test work to date, including mining and processing of a 10,000 ton representative bulk sample from VOK. (Snowden Report 14.)[4] Snowden indicated that the budgeted cost was

---

[3] Paragraph 62 of the Second Amended Complaint states that an independent geologist is known as an "Independent Qualified Period ('QP')." The word "Period" appears to be a typographical error given that a geologist is a person and not a time frame; this view is consistent with the use of QP throughout the Second Amended Complaint. (*See* SAC ¶¶ 5, 62-63.)

[4] "Snowden Report" refers to the Mineral Resources Update Technical Report, attached to the Declaration of William B. Michael ("Michael Decl.") as Exhibit 2. (Doc. 62-2.)

$20 million Canadian dollars ("CAD") for the drilling and associated studies and $30 million CAD for the underground bulk sample.  (*Id.* at 102.)

### 2.  June 2013 Feasibility Study

Pretium hired Tetra Tech to oversee and complete a feasibility study of the Brucejack Project.  (*See* SAC ¶ 110; Michael Decl. Ex. 8 at 1-1.)  Pretium also hired AMC Mining Consultants (Canada) Ltd. ("AMC") and Snowden to provide the "mineral reserve estimates" for the feasibility study.  (Michael Decl. Ex. 8 at 1-1; *see* SAC ¶ 5.)

On June 11, 2013, Pretium issued a press release announcing the feasibility study, specifically that:  (1) the VOK contained probable mineral reserves of 6.6 million ounces of gold; (2) the Brucejack Project mine would have a life of 22 years and produce 7.1 million ounces of gold; (3) the Brucejack mine would have an average annual production of 425,700 ounces of gold over the first ten years and 321,500 ounces of gold over the life of the mine; (4) the mine would operate with a processing rate of 2,700 tons per day and mine a total of 9.6 million tons of ore for the first ten years at an average mill feed grade of 14.2 grams gold per ton; (5) the mine's project capital costs, including contingencies, would be $663.5 million United States dollars ("USD"); and (6) the project's average operating costs would be $156.46 CAD per ton milled over the life of the mine.  (SAC ¶¶ 110-11.)  On June 28, 2013, Pretium filed a Form 6-K containing the results of its June 21, 2013 feasibility study (the "June 2013 Feasibility Study").  (SAC ¶ 113; *see generally* Michael Decl. Ex. 8.)

### 3.  Bulk Sample Program

Pretium hired Strathcona in late 2012 to oversee and report on its 10,000 ton bulk sample program, which included:  (1) excavation of a 10,000 ton bulk sample; and (2) a 15,000-meter underground drill program (the "Bulk Sample Program").  (SAC ¶¶ 5, 59-60; Michael Decl. Ex.

17 at 1.) On May 28, 2013, Pretium issued a press release concerning its Bulk Sample Program, and indicated that the first underground hole drilled as part of the VOK Bulk Sample Program intersected visible gold and confirmed the projection of high-grade gold mineralized domains. (SAC ¶ 69; Michael Decl. Ex. 5 at 1.) Pretium also announced that it was scheduled to begin excavation of the bulk sample in mid-June of 2013. (*See* Michael Decl. Ex. 5 at 2.) Pretium would utilize a sample tower and mill to process the excavation samples. (*Id.*) The 10,000 ton bulk sample would first be excavated in 100-ton rounds. (*Id.*) Each round would be crushed and run through the sample tower. (*Id.*) The sample tower would then extract two 30-kilogram representative samples from each 100-ton round that it processed. (*Id.*) The remainder of the bulk sample would be shipped to a mill for processing. (*Id.*)

Pretium disclosed that the assay results of the sample tower would be reported by Strathcona in its report on the Program, which was "expected later in the year after compilation of all data." (*Id.*) Pretium also disclosed that "[a]ssay results from underground drilling will be reported as they are received." (*Id.*)

Less than two weeks later, on July 23, 2013, Pretium issued a press release announcing that it had discovered the Cleopatra Vein. (SAC ¶ 117.) Pretium disclosed that the Cleopatra Vein was discovered while excavating "in an area of projected extreme grade mineralization." (July 23rd Press Release 1.)[5] Pretium further disclosed that the Cleopatra Vein was defined for approximately 85 meters, intersecting the 6258015N drill drift at the 426630E cross-section and trending to the southwest where it intersected the 426615 cross-cut and trended south along section 426615E. (*Id.*) Pretium also provided a map of the level plan and cross-sections of the Cleopatra Vein. (*Id.*) Pretium explained that "[p]lanning is underway with [Strathcona], the

---

[5] "July 23rd Press Release" refers to Michael Decl. Ex. 23. (Doc. 62-29.)

independent Qualified Person for the Program, to increase the portion of the bulk sample tonnage testing the higher grade blocks in the Indicated Mineral Resource estimate to the east of the 426600E cross-cut and decrease the portion of the bulk sample tonnage to the west of the 426600E cross-cut." (*Id.* at 2; SAC ¶ 83.) The press release reported all drill results from the Bulk Sample Program for July 2013. (July 23rd Press Release 3-7.) The press release distinguished the results from the Cleopatra Vein from the general bulk sample by including a header in bold font entitled either "Cleopatra Vein Drill Fan Section" or "Bulk Sample Drill Fan Section." (*Id.*) The press release also reiterated that the Brucejack project was being advanced as a high-grade mine with an expected average of 426,000 ounces of gold produced annually for the first 10 years, and an average of 321,500 ounces of gold produced annually for the mine's 22-year life. (*Id.* at 7-8.)

On August 1, 2013, Pretium issued a press release announcing highlights and significant events during its second quarter, including: (1) the June 2013 Feasibility Study results; (2) the July 2013 discovery of the Cleopatra Vein; and (3) working capital of $37.9 million. (Aug. 1st Press Release.)[6] The August 1st press release reiterated Pretium's view that Brucejack was being advanced as a high-grade underground mine with an average of 425,700 ounces of gold produced annually for the first ten years and an average of 321,500 ounces of gold produced annually over the mine's 22-year life. (*Id.* at 4.)

Two weeks later, on August 15, 2013, Pretium reported its underground drill results from the VOK and stated that assays from the program "continue to confirm the projection of high-grade gold mineralized domains, and visible gold continues to be encountered." (SAC ¶ 128 (emphasis omitted).) In accordance with Pretium's July 24th disclosure, the Company disclosed

---

[6] "Aug. 1st Press Release" refers to Michael Decl. Ex. 24. (Doc. 62-30.)

that it was moving the Bulk Sample Program's excavation location from 416585E-426615E to 426555E-426585E. (*Id.* ¶ 130.) It also disclosed that additional underground drilling and excavating was underway to test the extent of the Cleopatra Vein. (*Id.* ¶ 132.)

On September 9, 2013 and September 23, 2013, Pretium disclosed its drilling results and announced that these results continued to confirm the projection of high-grade gold mineralized domains. (*Id.* ¶¶ 134, 138, 140.) It also disclosed that the Company intended to continue excavating in the Cleopatra Vein. (*See* Michael Decl. Exs. 26, 27.)

Pretium then reported on October 3, 2013, that all excavated material from the Bulk Sample Program had been sampled by the sample tower and the material not designated for assaying was being shipped to a mill in Montana for processing. (SAC ¶ 142.) Pretium expected gold recoveries to average approximately 90%. (*Id.*) Pretium also stated that Strathcona was engaged as the independent QP to oversee and report on the Bulk Sample Program. (*Id.*)

### 4. Strathcona's Resignation

On October 9, 2013, Pretium issued a press release disclosing that Strathcona resigned prior to the completion of the Bulk Sample Program and the issuance of its report. (Michael Decl. Ex. 12 at 1.) This press release disclosed for the first time that Pretium expected "that approximately 4,000 ounces of gold will be produced in total from the material excavated for the Program, as defined by the Valley of the [2012 Resource Report] for that area of the Valley of the Kings." (*Id.*; SAC ¶ 147.) Following this announcement, Pretium's stock price dropped $2.07, or approximately 30 percent, to $4.70 per share when the market closed on October 9, 2013. (SAC ¶ 148.)

Two weeks later, Pretium issued a press release on October 22, 2013 informing the public that Strathcona advised the Company that:

> [T]here are no valid gold mineral resources for the VOK Zone, and without mineral resources there can be no mineral reserves, and without mineral reserves there can be no basis for a Feasibility Study . . . [S]tatements included in all recent press releases [by Pretium] about probable mineral reserves and future gold production [from the Valley of the Kings zone] over a 22-year mine life are erroneous and misleading.

(*Id.* ¶ 149; Michael Decl. Ex. 13 at 3.)  Strathcona further advised the Company that "[t]he infrequent high-grade intercepts reported in the press releases have been shown in the underground exposures of the bulk sample program to usually be of very narrow width (0.5 meters) and associated with narrow geological structures that occasionally have mineable continuity as in the case of the Cleopatra Vein."  (SAC ¶ 150; Michael Decl. Ex. 13 at 3.)  Following this announcement, Pretium's stock price dropped another $1.27, or approximately 27 percent, falling to $3.36 per share when the market closed on October 22, 2013.  (SAC ¶ 151.)

## II.  <u>Procedural History</u>

On October 25, 2013, the initial complaint in this case was filed by then-putative lead plaintiff Tim Kosowski.  (Doc. 1.)  On January 22, 2014, the Honorable Paul G. Gardephe, to whom this case was initially assigned, appointed Pretium Investor Group as lead plaintiff following briefing as to the most suitable lead plaintiff.  (Doc. 24.)  This case was reassigned to me on February 10, 2014.  (*See* Dkt. Entry Feb. 10, 2014.)

Plaintiffs filed their consolidated amended complaint on March 24, 2014.  (Doc. 39.) Defendants filed a pre-motion letter concerning its intention to file a motion to dismiss the consolidated amended complaint on April 9.  (Doc. 42.)  Plaintiffs filed their letter in response to Defendants' pre-motion letter on April 14, (Doc. 44), and I held a pre-motion conference to discuss Defendants' proposed motion on April 23, (Dkt. Entry Apr. 23, 2014).  Defendants filed their motion to dismiss the consolidated amended complaint on May 19, 2014.  (Doc. 48.) Plaintiffs filed their Second Amended Complaint on July 23, 2014.

On July 30, Defendants wrote on behalf of all parties to request a briefing schedule for Defendants' motion to dismiss the Second Amended Complaint, (Doc. 55), and the following day an endorsement was filed granting the request and setting a briefing schedule, (Doc. 56). Defendants filed their motion to dismiss the Second Amended Complaint, (Doc. 60), along with their memorandum of law, (Doc. 61 ("Defs.' Mem.")), and declaration of William B. Michael and supporting exhibits on September 5, 2014, (Doc. 62). Plaintiffs opposed Defendants' motion on October 20, 2014. (Doc. 65 ("Pls.' Opp.").) And Defendants filed their reply in further support of their motion to dismiss on November 19, 2014. (Doc. 68 ("Reply Mem.").)

During the pendency of this motion, the Supreme Court issued *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015). The parties have provided me with letters containing their arguments related to how *Omnicare* impacts this case as well as additional supplemental authority, all of which I have considered in rendering my decision. (Docs. 71-73, 75-76, 78-82.)

## III. <u>Legal Standard</u>

### A. *Motion to Dismiss*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements,

and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

### B. *Securities Fraud – Section 10(b) Claims*

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI*, 493 F.3d at 99; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Federal Rule of Civil Procedure 9(b) requires a securities fraud claim to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This standard requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99 (citation omitted). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.*

The Private Securities Litigation Reform Act (the "PSLRA") also imposes a heightened pleading standard on securities fraud complaints. *See* 15 U.S.C. § 78u–4(b); *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 Civ. 2700(PKC), 2012 WL 3957916, at *7 (S.D.N.Y. Sept. 10, 2012) ("Courts must dismiss pleadings that fail to adhere to the requirements of the PSLRA."). To

satisfy the PSLRA, a securities fraud complaint must "'specify' each misleading statement"; "set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'"; and "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u–4(b)). Although a court ordinarily draws all reasonable inferences in favor of the plaintiff, the PSLRA "establishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (internal quotation marks omitted).

Rule 10b-5, promulgated under Section 10(b) of the Exchange Act, provides in pertinent part that it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

## 1. Materiality

Materiality is a fact specific inquiry as to whether "there is a substantial likelihood that a reasonable shareholder would consider [the stated or omitted fact] important in deciding how to act." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (quoting *Basic v. Levinson*, 485 U.S. 224, 231 (1988)). In other words, courts determine whether a reasonable

investor would have considered the statement or omission "significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). When considering an omission, the question becomes whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Hutchison*, 647 F.3d at 485 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Materiality is, however, a mixed question of law and fact, and a complaint may not be dismissed on the basis that the alleged misstatements or omissions are not material "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197 (quotations omitted).

### 2. Falsity

#### a. Statements of Fact

A Section 10 plaintiff must not only assert that a representation is material but also that it is false and "demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *accord Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152–53 (2d Cir. 2013). "Falsity is a failure to be truthful—it is not a misapprehension, misunderstanding, or mistake of fact at the time a statement was made." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (quoting *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 813 (2d Cir. 1996)). The "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Kleinman*, 706 F.3d at 153 (citation omitted). Statements that are literally true may become misleading based upon "their context and manner of presentation." *Id.*

And "whether a statement is 'misleading' depends on the perspective of a reasonable investor: The inquiry . . . is objective." *Omnicare*, 135 S. Ct. at 1327.[7]

Section 10 "do[es] not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Rather, an "omission is actionable under the securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). "Such a duty may arise expressly, pursuant to a statute or regulation, or implicitly as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts." *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, No. 12-cv-0256 (LAK), 2015 WL 5311196, at *9 (S.D.N.Y. Sept. 11, 2015) (internal quotation marks omitted). Indeed, "once a party chooses to speak, . . . it has a 'duty to be both accurate and complete.'" *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp. 2d 166, 180 (S.D.N.Y. 2010) (quoting *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002)).

### b. Statements of Opinion or Belief

In *Omnicare*, the Supreme Court held that a plaintiff may demonstrate that a statement of opinion or belief is false by alleging that: (1) the opinion or belief is itself a factual misstatement; *or* (2) the opinion or belief is misleading due to the omission of a material fact. 135 S. Ct. at 1326-27. A statement of opinion is itself a statement that the speaker holds the relevant belief. *Id.* at 1326. Therefore, an opinion or belief is actionable if "the 'defendant's opinions were both false and not honestly believed when they were made.'" *Kleinman*, 706 F.3d at 153 (quoting *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011)). Even if a

---

[7] *Omnicare* analyzed the misleading nature of a statement under Section 11. The test for whether a statement is materially misleading under Section 11 is the same as the test under Section 10(b). *See Rombach*, 355 F.3d at 178 n.11.

statement of opinion is literally accurate, i.e. it is honestly held, it may still be actionable if the opinion omits to state facts necessary to make the opinion not misleading. *Omnicare*, 135 S. Ct. at 1327-28. To establish that an opinion statement was misleading on the basis of an omitted fact, a plaintiff must: (1) identify the omitted fact; (2) show that "the omitted fact would have been material to a reasonable investor"; (3) establish that the omission rendered the opinion misleading to a reasonable investor; and (4) take into account the "statement's context," including relevant "hedges, disclaimers, or qualifications." *Id.* at 1333.

The Second Circuit recently offered an interpretation of *Omnicare* in *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016). The *Tongue* court found that *Omnicare* altered the standard announced by the Second Circuit in *Fait*. While the *Tongue* court noted that "*Omnicare* affirmed that liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue,'" *id.* at 210 (quoting *Omnicare*, 135 S. Ct. at 1327), it highlighted that *Omnicare* also went on to "hold that opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor," *id.* (citing *Omnicare*, 135 S. Ct. at 1332).

However, the *Tongue* Court emphasized the Supreme Court's "caution[] against an overly expansive reading of [the *Omnicare*] standard." *Id.* Specifically, it pointed to the Supreme Court's emphasis on the idea that "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts," and that "[a] reasonable investor does not expect that every fact known to an issuer supports its opinion statement." *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329). These cautions mean that "a statement of opinion 'is not necessarily misleading when

an issuer knows, but fails to disclose, some fact cutting the other way.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329).

### 3. State of Mind – Scienter

Pursuant to the PSLRA, a well-pleaded securities fraud claim must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). "The requisite state of mind in a section 10(b) and Rule 10b–5 action is an intent 'to deceive, manipulate, or defraud.'" *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 313). In the Second Circuit, a strong inference of scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* Conscious misbehavior "encompasses deliberate illegal behavior," *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000), whereas recklessness includes "conscious recklessness" or "a state of mind approximating actual intent, and not merely a heightened form of negligence," *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 312). A plaintiff adequately pleads recklessness where it alleges that the defendant: (1) knew facts or had access to information contradicting its public statements; or (2) failed to review or check information that it had a duty to monitor. *See Novak*, 216 F.3d at 308. "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309).

If motive to commit fraud has not been shown, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)

(quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).  In addition, a strong

inference of scienter "must be more than merely plausible or reasonable—it must be cogent and

at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at

314.

Prior to the passage of the PLSRA, a plaintiff could allege scienter as to individual

defendants and the company if the misleading statements and/or omissions related to a core

operation of the company.  *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989).  However, since

the enactment of the PSLRA, the Second Circuit has expressed doubt as to whether the core

operation doctrine has survived.  *See Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir.

2012) (summary order) ("[W]e have not yet expressly addressed whether, and in what form, the

'core operations' doctrine survives as a viable theory of scienter.").  However, the Second Circuit

commented that the doctrine can "provide supplemental support for allegations of scienter, even

if [it] cannot establish scienter independently."  *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,

455 Fed. App'x 10, 14 n.3 (2d Cir. 2011) (summary order).  Many courts in this District have

questioned the continued viability of the core operations doctrine following the PSLRA.  *See*

*Cortina v. Anavex Life Scis. Corp.*, No. 15-CV-10162 (JMF), 2016 WL 7480415 (Dec. 29, 2016);

*In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) (collecting cases)

("[T]he plain language of the PSLRA, which requires facts supporting the scienter inference to

be 'stated with particularity,' would seem to limit the force of general allegations about core

company operations." (quoting 15 U.S.C. § 78u–4(b)(1))).  Without surer guidance from the

Second Circuit, I will apply the modified approach followed by most courts, and consider the

"core operations" allegations to constitute supplementary, but not an independent, means to plead

scienter.  *See Fialkov v. Alcobra Ltd.*, No. 14 Civ. 09906 (GBD), 2016 WL 1276455, at *7

(S.D.N.Y. Mar. 30, 2016) ("The majority of courts in the Second Circuit have found that the core operations doctrine may provide support for but not an independent basis of scienter." (citation omitted)).

With these legal principles in mind, I now turn to the allegations of the SAC to analyze whether or not Plaintiffs adequately allege a securities law violation.

## IV. Discussion

### A. Misleading Statements of Fact

The SAC alleges Pretium issued the following misleading facts: (1) statements on July 23, 2013 and August 1, 2013 that planning was underway with Strathcona to increase the Bulk Sample Program, (SAC ¶¶ 120-25); and (2) selective disclosures about the Cleopatra Vein drilling, (*id.* ¶¶ 117-19, 126-27, 132-33).

#### 1. Planning Underway With Strathcona

Defendants contend that there is nothing misleading about Defendants' July 23 statement that "planning" was underway with Strathcona "to increase the portion of the bulk sample tonnage testing the higher grade blocks in the Indicated Mineral Resource estimate to the east of the 426600E cross-cut and decrease the portion of the bulk sample tonnage to the west of the 426600E cross-cut"—in other words, from areas near the Cleopatra Vein. (Reply Mem. 5.) I disagree. Strathcona's disagreement regarding continued drilling in the Cleopatra Vein would certainly be material information to a reasonable investor. The 2012 Resource Report and June 2013 Feasibility Study recommended that Pretium conduct the Bulk Sample Program to test the accuracy of their projections. (*See* 2012 Resource Report 1.5.2; June 2013 Feasibility Study 26-1.) Strathcona was the independent QP overseeing the Bulk Sample Program, (*see* June 11, 2013 Press Release 2; September 23, 2013 Press Release 2), and therefore in a position to remark on

the meaning of the results of the Bulk Sample Program.  Given this context, a reasonable investor could infer that Pretium's statement that it was "planning . . . *with Strathcona* . . . , the independent Qualified Person for the Program" to increase the sampling and testing in the area of the Cleopatra Vein as Strathcona's endorsement of this plan.  (July 23 Press Release 2 (emphasis added); SAC ¶ 120.)  The SAC goes on to specifically allege that this statement is false— "Strathcona was not on board with any plans to change the testing of the Bulk Sample, and in fact, had been pressuring Pretium to make full disclosure of the Bulk Sample results so that investors would know that the resource model was not 'panning out.'"  (SAC ¶ 121.)

With regard to Defendants' knowledge of the falsity of this statement, although a closer call, I find that the SAC adequately alleges that Defendants knew or should have known that this statement was false.  The SAC asserts that Strathcona began alerting Pretium that the early assay results did not confirm the 2012 Resource Report during the week of June 23, 2013, (*id.* ¶ 78), and ultimately withdrew on October 8, 2013 after again advising Pretium that the Bulk Sample Results were not representative of the Cleopatra Vein and the VOK as a whole, and that Pretium's recent press releases were misleading, (Michael Decl. Ex. 13 at 3.)  These allegations suggest that Strathcona raised its disagreement concerning a proposed change to the Bulk Sample Program at some point (and on more than one occasion) between June 2013 and October 2013.

"[A] complaint need only apprise a defendant of the general time period of any alleged misstatements to meet the requirements of Rule 9(b)."  *Rana v. Islam*, 305 F.R.D. 53, 58 (S.D.N.Y. 2015) (internal quotation marks omitted); *accord In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) ("Plaintiffs need not allege 'the exact date and time' when defendants became aware of information contrary to their statements, but plaintiffs must

'supply some factual basis for the allegation that the defendants knew or should have known that the statements were false at some point during the time period alleged.'" (quoting *Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000))); *In re Revlon, Inc. Secs. Litig.*, No. 99 Civ. 10192(SHS), 2001 WL 293820, at *8 (S.D.N.Y. Mar. 27, 2001) ("[A] plaintiff need not plead dates, times, and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based."). And courts have found allegations of misrepresentations during a two month and a three and one half month period sufficiently specific. *Rana*, 305 F.R.D. at 58. Likewise, I find that Plaintiff's three and one half month period is sufficiently specific to enable Defendants to submit an answer and prepare for trial in accordance with the requirements of Rule 9(b) and the PSLRA. Consequently, I find that Plaintiffs adequately alleged a misleading statement of fact.

### 2. Cleopatra Vein Omission

The SAC alleges that Defendants' disclosures of high grade drilling results in the Cleopatra Vein were misleading because Defendants failed to disclose that: (1) the Cleopatra Vein was a narrow geological structure that was not representative of the VOK overall; and (2) drilling had expanded into the narrow Cleopatra Vein to conceal the fact that the Bulk Sample was not yielding favorable results. (SAC ¶¶ 117-19.) I do not find this contention persuasive because Defendants substantially disclosed this information to investors.

"An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 (2d Cir. 2005) (quoting *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993)). Here, the same documents on which the SAC relies for the purported misstatements disclose the information Plaintiffs claim Pretium to have

omitted.  Pretium announced that the Cleopatra Vein was discovered "in an area of projected *extreme* grade mineralization," (July 23rd Press Release 1 (emphasis added); *see also* Aug. 1st Press Release 3; Aug. 15th Press Release 2[8]), which suggests on its face that the area's grade mineralization exceeded the ordinary.  In addition, Pretium's July 23rd announcement attached a map of the level plan and cross-sections of the Cleopatra Vein and provided the geological structure's dimensions—approximately 85 meters along the strike and 50 meters above the 1345-meter level and 50 meters below the 1345-level.  (July 23rd Press Release at 1; *see also* Aug. 1st Press Release 3; Aug. 15th Press Release 2.)  These announcements effectively disclosed that Pretium intended to continue excavating in the Cleopatra Vein in atypical ("high-grade" and "extreme-grade") regions.  (*See* July 23rd Press Release 1-2; Aug. 1st Press Release 3; Aug. 15th Press Release 2.)  Pretium's disclosure of the very information Plaintiffs contend Pretium to have omitted therefore renders these purported omissions immaterial as a matter of law.  *See Starr*, 412 F.3d at 110 (affirming dismissal of omissions as immaterial because prior company disclosures contained the precise information alleged to have been withheld); *In re Vivendi Universal S.A. Sec. Litig.*, No. 02 Civ. 5571(RJH), 2004 WL 876050, at *5 (S.D.N.Y. Apr. 22, 2004) (dismissing claim that defendant omitted sales of put options to banks because "[p]laintiffs' allegation that the put options were not disclosed to them is contradicted by the very documents they rely on in bringing their complaint").

### B.  *Misleading Statements of Opinion*

The essence of the SAC's allegations related to misleading statements of opinion are Pretium's prediction that the Brucejack Project would be a high-grade, high-production mine estimated to produce 425,700 ounces of gold annually for the first ten years and an average of

---

[8] "Aug. 15th Press Release" refers to Michael Decl. Ex. 25.  (Doc. 62-31.)

321,500 ounces of gold produced annually over the mine's 22 year life. (SAC ¶¶ 7, 49, 110, 122.) Plaintiffs assert that this forecast was misleading because Defendants failed to disclose information available to Pretium including: (1) Strathcona's concern that the Brucejack Project would not be economically viable for bulk mining; (2) negative results from the Bulk Sample Program; and (3) that the Cleopatra Vein was narrow and unrepresentative of the VOK region. For the reasons that follow, after accepting as true all well-pleaded facts alleged in the Second Amended Complaint and drawing all reasonable inferences in Plaintiffs' favor, I find that there is no basis for a reasonable trier of fact to conclude that Pretium did not honestly believe its forecasts for the Brucejack Project at the time that it issued the forecasts.

At the outset, the parties disagree regarding whether Pretium's estimates were expressions of opinion or statements of fact. To resolve this dispute I refer to the discussion in *Omnicare* concerning the distinction between facts and opinions. The Court held that in some instances an opinion is purely a statement of opinion, while in other situations an opinion contains embedded statements of fact. *Omnicare*, 135 S. Ct. at 1327. "A fact is a thing done or existing," whereas "[a]n opinion is a belief, a view, or a sentiment which the mind forms of persons or things." *Id.* at 1325 (alteration and internal quotation marks omitted). Indeed, "[m]atters of opinion include subjective statements that reflect 'judgments as to values that [are] not objectively determinable.'" *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 653 (S.D.N.Y. 2012) (quoting *Fait*, 655 F.3d at 109-10). "Statements estimating the fair market value of assets are opinions, not matters of objective fact." *Id.* With these definitions and examples in mind, I find that Pretium's projections regarding the Brucejack Project's future productivity and profitability are statements of opinion since they do not express presently existing objective facts. *See In re Sanofi Sec. Litig*, No. 13 Civ. 8806(PAE), 2015 WL 365702, at *15 (S.D.N.Y.

Jan. 28, 2015) (expressions of "expectations for the future" are opinions); *City of Monroe Emps.'*

*Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10 Civ. 2835(NRB), 2011 WL 4357368, at *19

n.54 (S.D.N.Y. Sept. 19, 2011) (growth projections are statements of opinion). In fact, Pretium's

SEC filings advised investors that estimating mineral reserves and mineral resources is a

subjective process that relies on the judgment of the persons preparing the estimates. (Michael

Decl. Ex. 3 at A-21 ("The estimating of mineral reserves and mineral resources is a subjective

process that relies on the judgment of the persons preparing the estimates. The process relies on

the quantity and quality of available data and is based on knowledge, mining experience, analysis

of drilling results and industry practices. Valid estimates made at a given time may significantly

change when new information becomes available. By their nature, mineral resource estimates

are imprecise and depend, to a certain extent, upon analysis of drilling results and statistical

inferences that may ultimately prove to be inaccurate.").)

Pretium hired two independent QPs specifically tasked with providing mineral

estimates—Snowden and AMC—and another QP, Tetra Tech, for overall project management

and to complete the June 2013 Feasibility Study. (Michael Decl. Ex. 8 at 1-1, 1-4, 2-1.)

Strathcona was not hired to provide mineral estimates or to participate in the June 2013

Feasibility Study. (*Id.*) Nonetheless, Strathcona informed Pretium that it did not agree with the

Snowden model or Pretium's estimates concerning the Brucejack Project. (*See* SAC ¶¶ 72-73.)

With regard to QPs, the Second Amended Complaint alleges that the "lynchpin of the QP is

independence" and that "an independent QP's opinions and findings are presumed to be unbiased

and fact-based." (*Id.* ¶ 64.) Therefore, the opinions and findings of Snowden, Tetra Tech, AMC,

and Strathcona are "presumed to be unbiased and fact-based."

According to the SAC, "Pretium criticized Strathcona's conclusions as premature and claimed that Strathcona should have waited for the Program to be complete." (*Id.* ¶ 16.) Pretium later explained that Strathcona formulated its opinion on the basis of "approximately 20% of the underground drilling results, no assay results from the sample tower and no results from production." (*Id.* ¶ 74.) In addition, Pretium had expressed concern "that the sampling tower approach for the Valley of the Kings deposit may be flawed." (*Id.* ¶ 16.) Plaintiffs point to no facts that show that Pretium did not expect and believe the *final* results of the Bulk Sample Program would support its estimates of the Brucejack Project. Instead, these facts support Pretium's narrative that it simply did not find Strathcona's conclusions regarding the Brucejack Project to be credible because they were premature. *See In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 567 (S.D.N.Y. 2011) ("Plaintiffs cannot premise a fraud claim upon a mere disagreement with how [defendants] chose to interpret the results.").

The theme of Plaintiffs' Second Amended Complaint is essentially that Pretium spun the tale of El Dorado, touting the VOK as a place of immense gold reserves and untold riches yet to be discovered. However, in the case of El Dorado the treasure seekers actually believed that the illusive city of gold existed. Such appears to the case here. Under Plaintiffs' theory, Pretium invested tens of millions of dollars into drilling and associated studies in a venture that it secretly believed would not be profitable. *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) ("[T]he initiation of Phase 3 cost millions of dollars and required FDA approval, rendering it improbable that defendants would have continued if they did not believe their interpretation of the interim results or if they thought the drug a complete failure."); *Davidoff v. Farina*, No. 04 Civ. 7617(NRB), 2005 WL 2030501, at *11 n.19 (S.D.N.Y. Aug. 22, 2005) ("[I]t would have made no economic sense for defendants to invest literally billions of

dollars in a venture that they knew would fail.").  Such a theory is implausible; therefore,

Plaintiffs have failed to plead subjective falsity.  And Plaintiffs have not, and in fact cannot,

plead objective falsity because Pretium's projections have yet to be realized—the total amount of

gold in the VOK and the amount of gold that the Brucejack Project will produce over 22 years is

still unknown.  The mere fact that Strathcona disagreed with these estimates does not make the

estimates objectively false.  In fact, since Strathcona was not tasked with providing mineral

estimates or with participating in the management or completion of the June 2013 Feasibility

Study it was arguably not positioned to credibly cast doubt on the estimates.  Following

*Omnicare*, however, my inquiry does not end here.

The principal thrust of the SAC's allegations is that Pretium's opinion statements omitted

material facts rendering its predictions and estimates concerning the Brucejack Project

misleading.  "An opinion statement, however, is not necessarily misleading when an issuer

knows, but fails to disclose, some fact cutting the other way."  *Omnicare*, 135 S. Ct. at 1329.

"[W]hether an omission makes an expression of opinion misleading always depends on context."

*Id.*  And "an investor reads each statement . . . in light of all its surrounding text, including

hedges, disclaimers, and apparently conflicting information."  *Id.* at 1330.

Here, Pretium fully disclosed to investors (prior to even beginning the sample tower

program) that Strathcona would report the sample tower results in its report on the program after

all of the data was compiled later in the year.  (*See* Michael Decl. Ex. 5 at 2 (assay results of the

sample tower would "be reported as they are received," but that "Strathcona's report on the

Program is expected later in the year after compilation of all data"), Ex. 6 at 1-2 (noting that the

"drill program will run concurrently with the excavation of the 10,000-tonne bulk sample

scheduled to begin in mid-June and be completed in August.").)  Strathcona, however, resigned

before preparing its report.  (*See id.* Ex. 13 at 3.)  Reasonable investors therefore would not and could not have expected that Pretium's estimates would be based on a non-existent report.  Nor would reasonable investors have found Pretium's disclosures of drilling results from the Cleopatra Vein misleading because, contrary to the conclusory allegations in the SAC, Pretium already disclosed information from which a reasonable investor could have concluded that the Cleopatra Vein was narrow and not typical of the VOK region.  (*See supra* Section IV.A.2.)

The question therefore becomes whether or not Pretium had a duty to disclose, at an earlier date, Strathcona's opinion that the Company's projections of gold within, and performance of, the Brucejack Project were inaccurate and/or false.

Although Defendants do not directly dispute that Strathcona's opinions were material facts, I address this issue to remove any doubt concerning the materiality of Strathcona's opinions.  "[A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view."  *Omnicare*, 135 S. Ct. at 1328.  As explained above, Pretium disclosed that Strathcona was the independent QP overseeing the Bulk Sample Program—the purpose of which was to confirm the accuracy of Snowden model's predictions about the Brucejack Project.  Its opinions therefore consisted of the type of information that a reasonable investor rightly could have expected to form the basis of Pretium's estimates.  *See Omnicare*, 135 S. Ct. at 1328.  Here, Strathcona's opinions were disclosed on October 22, 2013:

> Strathcona advised Pretium that "there are no valid gold mineral resources for the VOK Zone, and without mineral resources there can be no mineral reserves, and without mineral reserves there can be no basis for a Feasibility Study."  They also advised that "statements included in all recent press releases by Pretium about probable mineral reserves and future gold production [from the Valley of the Kings zone] over a 22-year mine life are erroneous and misleading."

(Michael Decl. Ex. 13 at 3.)  In Strathcona's opinion, Pretium had provided misleading information to investors.

The key inquiry, however, is *when* Pretium's duty to disclose Strathcona's opinions arose. It is true that "once a party chooses to speak, . . . it has a 'duty to be both accurate and complete.'"  *Plumbers' Union Local No. 12 Pension Fund*, 753 F. Supp. 2d at 180 (quoting *Caiola*, 295 F.3d at 331).  However, a party is also entitled to investigate potentially negative information before making statements to the market.  As Chief Judge Easterbook explained: "Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention. . . .  Taking the time necessary to get things right is both proper and lawful.  Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal."  *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760-61 (7th Cir. 2007); *see also In re Agnico-Eagle Mines Ltd. Sec. Litig.*, No. 11 Civ. 7968(JPO), 2013 WL 144041, at *21 (S.D.N.Y. Jan. 14, 2013) *aff'd sub nom. Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 Fed. App'x 38 (2d Cir. 2013) (summary order); *Johnson v. Siemens AG*, No. 09-CV-5310 (JG)(RER), 2011 WL 1304267, at *18 (E.D.N.Y. Mar. 31, 2011).  That is precisely what Pretium did.

Pretium viewed Strathcona's opinions "as premature and claimed that Strathcona should have waited for the Program to be complete."  (SAC ¶ 16.)  In particular, Pretium was concerned "that the sampling tower approach for the Valley of the Kings deposit may be flawed."  (*Id.*)  Pretium investigated Strathcona's opinions for several months.  As discussed above, it is unclear when exactly Pretium learned of Strathcona's concerns.  At most, Pretium took four months— from around June 23, 2013, when Strathcona allegedly alerted Pretium that it did not believe that the early results conformed with the 2012 Resource Report, until October 22, 2013, when

Pretium disclosed the disagreement—to investigate Strathcona's concerns. This is a reasonable period of time under all the circumstances presented here, namely, the size and scope of the project and the competing QP opinions. Thus, Plaintiff's challenge to the timing of Pretium's disclosure of Strathcona's opinions is therefore insufficient to sustain a claim of securities fraud.[9]

## C. *Scienter*

Finally, with regard to Defendants' scienter, Plaintiffs allege no facts suggesting that Defendants engaged in any deliberate illegal behavior; therefore, I only consider whether Plaintiffs adequately plead recklessness. Defendants assert that Plaintiffs have not adequately pled that they had the motive and opportunity to commit fraud because the allegations of the Second Amended Complaint are too generalized to allege the proper "concrete and personal" benefit required by the Second Circuit. (Defs.' Mem. 25.) I agree.

In order to show motive and opportunity, Plaintiffs must allege that Pretium or the Individual Defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 307–08). Here, Plaintiffs point to no facts suggesting that Defendants had a motive to make fraudulent misstatements. They do not allege that Defendants sold any company stock prior to Pretium's purported corrective disclosures. Nor do they allege that Defendants directly profited from the alleged misstatements or omissions.

Rather, Plaintiffs assert that: (1) Pretium's "future hinges on proving the economic feasibility of mining" the Brucejack Project, (SAC ¶ 3); and (2) "Defendant Quartermain was subject to an employment contract with Pretium whereby he was entitled to an annual performance bonus of 0.25% of the annual increase in the market capitalization of the Company

---

[9] Given my determination that Pretium's projections and estimates concerning the Brucejack Project were not misleading and therefore not actionable misstatements or omissions, I decline to address Defendants' argument that these opinions were forward-looking statements.

(provided the increase in market capitalization was 10% or more)," (*id.* ¶ 156). These purported

motives are legally insufficient. The Second Circuit has unequivocally held that "[m]otives . . .

common to most corporate officers, such as the desire for the corporation to appear profitable

and the desire to keep stock prices high to increase officer compensation, do not constitute

'motive' for purposes of this inquiry." *ECA*, 553 F.3d at 198. And "[t]he alleged motivation of a

corporation to raise money to prevent the negative ramifications of a drop in stock price—even if

such a drop would allegedly threaten the 'survival' of a company—is far too generalized (and

generalizable) to allege the proper 'concrete and personal' benefit required by the Second

Circuit." *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009). There is

also an insufficient link between the corporate performance alleged and Defendant Quartermain's

bonus; "[i]f scienter could be pleaded solely on the basis that defendants were motivated because

an inflated stock price or improved corporate performance would increase their compensation,

'virtually every company in the United States that experiences a downturn in stock price could

be forced to defend securities fraud actions. Incentive compensation can hardly be the basis on

which an allegation of fraud is predicated.'" *ECA*, 553 F.3d at 201 (quoting *Acito v. IMCERA

Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)) (rejecting argument that officers had requisite scienter

on the basis that they received bonuses based on corporate earnings and higher stock prices).

Consequently, the allegations that Pretium's economic survival and Defendant Quartermain's

compensation relied upon the Brucejack Project are insufficient and consequently have no

bearing on Defendants' motive and opportunity as a matter of law.[10]

---

[10] Apparently, Plaintiffs realized after reviewing Defendants' opening brief that the allegations in the Second Amended Complaint were insufficient because in their opposition Plaintiffs abandoned the theories of scienter alleged in the Second Amended Complaint. Specifically, Plaintiffs do not defend the conclusory allegations that Defendants knew that their statements were materially false and misleading, (Pls.' Opp. 24-25), nor do they argue that the allegations in the Second Amended Complaint are sufficient to establish motive and opportunity to commit fraud. (*Id*. 25-26.)

Instead, Plaintiffs posit that Defendants possessed the requisite scienter under a theory of conscious misbehavior or recklessness. I have determined that the only surviving actionable misstatement in this case is Pretium's disclosure that planning was underway with Strathcona to alter the Bulk Sample Program and to continue drilling in the Cleopatra Vein and need not consider whether Plaintiffs properly alleged scienter as to the dismissed alleged misleading statements. However, in an abundance of caution, I review whether Plaintiffs set forth facts indicating Defendants' recklessness as to all categories of alleged misstatements and/or omissions. As explained below, Plaintiffs failed to do so.

Plaintiffs failed to allege scienter with regard to Defendants' misstatement related to Pretium's disclosure that planning was underway with Strathcona to alter the Bulk Sample Program and continue drilling in the Cleopatra Vein. Pretium's disclosure of accurate information regarding the discovery and composition of the Cleopatra Vein precludes a finding of Defendants' scienter. Pretium disclosed that the Cleopatra Vein was discovered "in an area of projected *extreme* grade mineralization," (July 23rd Press Release 1 (emphasis added)), and Pretium also produced a map of the level plan and cross-sections of the Cleopatra Vein and provided the geological structure's dimensions—approximately 85 meters along the strike and 50 meters above the 1345-meter level and 50 meters below the 1345-level, (*Id.*; *see also* Aug. 1st Press Release 3; Aug. 15th Press Release 2). These announcements demonstrate candor, care, and prudence, not recklessness.

The Second Amended Complaint makes clear that there was a difference of opinion between Strathcona and Pretium concerning the potential for economic success of the Brucejack Project. "However, differences of opinion, even stark differences . . . do not reveal scienter." *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013).

Moreover, Plaintiffs generally state that this forecast was misleading because the sample tower results did not support the forecast and Strathcona did not believe that the Brucejack Project would be economically viable. However, nowhere in the Second Amended Complaint do Plaintiffs identify with specificity the documents or way in which this contrary information was communicated to Defendants. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." (quoting *Novak*, 216 F.3d at 309)); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272–73 (S.D.N.Y. 2009) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information to indicate how it was inconsistent with the statements made."). Strathcona never completed its report regarding the sample tower results and Plaintiffs fail to allege how or when the sample tower results were communicated to Defendants. Furthermore, the Second Amended Complaint provides no details regarding how, or in what form, Strathcona communicated its opinions to Defendants. Most importantly, the Second Amended Complaint fails to allege any facts suggesting that Defendants should have known that they were perpetrating a fraud—this may be due at least in part to the fact that Defendants' subsequent findings actually supported its forecast concerning the Brucejack Project, thereby virtually precluding such a determination. At most, the Second Amended Complaint alleges that Defendants may have been negligent in failing to disclose contrary information as to its predictions about the Brucejack Project. This, however, does not amount to recklessness, and Plaintiffs have therefore failed to plead the requisite scienter under Section 10. Finally, upon careful consideration, I find that a reasonable person would not deem Plaintiffs' purported inference of scienter to be "at least as compelling as

any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The remaining miscellaneous scienter allegations, taken together, do not rise to the level of a compelling inference of scienter.[11]

Because the § 10(b) claims must be dismissed, there is no basis for a primary violation upon which any § 20(a) claim might be predicated. Consequently, Defendants' motion to dismiss Plaintiffs' claim brought pursuant to § 20(a) is also granted.

## V.    Conclusion

For the foregoing reasons Plaintiffs' Second Amended Complaint is DISMISSED and Defendants' Motion to Dismiss is GRANTED. The Clerk of the Court is respectfully directed to terminate the pending motions, (Docs. 60, 84), and close this case.

SO ORDERED.

Dated: June 13, 2017
        New York, New York

Vernon S. Broderick
United States District Judge

---

[11] Plaintiffs fail to plead any "known trends or uncertainties" in violation of Item 303 as a matter of law because "a two month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303." *Blackmoss Inv. Inc. v. ACA Capital Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010).